[No. G040863. Fourth Dist., Div. Three. May 21, 2009.]

In re the Marriage of KATHRYN A. and EARL E. LUND, JR.
KATHRYN A. LUND, Appellant, v.
EARL E. LUND, JR., Respondent.

42

**COUNSEL**

Law Offices of Steven E. Briggs and Steven E. Briggs for Appellant.

Hughes and Sullivan, Bruce A. Hughes and Lisa Hughes for Respondent.

**O**PINION

**IKOLA, J.**—As part of their dissolution of marriage proceedings, appellant Kathryn A. Lund and respondent Earl E. Lund, Jr., contested whether Earl transmuted his separate real properties into community property by way of a written agreement executed in 2002.[1] The court below, conducting a bifurcated trial of this issue pursuant to California Rules of Court, rule 5.175, determined Earl had not transmuted his separate property and, even if he had, Kathryn did not meet her burden of establishing she had not unduly influenced Earl in the execution of the agreement at issue. We granted Kathryn's motion to appeal the court's interlocutory order (Cal. Rules of Court, rule 5.180(d)) and now reverse. Earl made "an express declaration" in writing of his unambiguous intention to transmute all of his separate property as of the date he executed the 2002 agreement. (Fam. Code, § 852, subd. (a).)[2] The court erred in finding the agreement to be ambiguous and in finding Earl was unduly influenced. A valid transmutation of Earl's separate property occurred.

## FACTS

Kathryn and Earl married in August 1990. Kathryn had one daughter from a previous marriage, Earl had a son and daughter from a previous marriage (both of whom Kathryn adopted), and the parties together had a son following their marriage. Kathryn petitioned for dissolution of marriage in March 2004, and Earl's response to the petition also included a request for dissolution of marriage.

The issue before us is whether a document executed by the parties on December 12, 2002 (entitled "Agreement to Establish Interest in Property of Earl E. Lund, Jr., and Anne K. Lund"), effectively transmuted various real properties from the separate property of Earl to the community property of Earl and Kathryn. On that day, Kathryn spent approximately 20 minutes at a law firm reviewing and signing various documents (along with the aforementioned agreement, the "Last Will and Testament of Anne K. Lund" and "The Earl E. Lund, Jr. Trust"). She had not reviewed any of the documents before her arrival at the law office. Kathryn met Earl at the law office on his lunch hour; there is no testimony in the record regarding Earl's level of familiarity with or understanding of the documents at issue. (Earl did not testify.)

The parties disagree as to the meaning of the "Agreement to Establish Interest in Property," and further disagree as to whether the other documents

---

[1] We use the first names of the parties for ease of reference and clarity. We intend no disrespect.

[2] All statutory references are to the Family Code unless otherwise specified.

executed on December 12, 2002, should play any role in the interpretation of the agreement at issue. We quote in detail below relevant provisions of the various documents signed by the parties on December 12, 2002.

*Agreement to Establish Interest in Property of Earl E. Lund, Jr., and Anne K. Lund[3]*

"THIS AGREEMENT, made and entered into this 12 day of December 2002, by and between Earl E. Lund, Jr., of the County of Orange, State of California, hereinafter called 'Husband', and Anne K. Lund,[4] of the County of Orange, State of California, hereinafter called 'Wife'.

## "RECITALS

"A. It is the intention of the parties hereto, by this Agreement, to fix and establish their respective interests and rights in all property now owned by them or hereafter acquired by them, except as to property hereinafter acquired by gift, bequest, devise or descent, whether held in their names, as joint tenants, tenants in common, or otherwise for estate planning;

"B. The parties hereto are husband and wife, and have continuously maintained their legal residence in the State of California during their marriage; and

"C. At the date of marriage, Husband owned property, real or otherwise of substantial value and wife had assets of de minim[i]s value; and

"D. The Husband, for estate planning purposes desires to convert said separate property into community property.

"NOW, THEREFORE, in order to evidence, confirm and ratify their agreement and intention it is agreed as follows:

"A. ~~SEPARATE PROPERTY: The following properties are acknowledged to be the separate property of:~~

---

[3] Due to the importance of this agreement in examining the issues before us (and the relatively small size of the agreement), this part reproduces most of the agreement as it exists in the record. Other than the footnotes wherein we have added necessary explanation, the entire part is a quotation of the agreement.

[4] The documents at issue refer to "Anne K. Lund" as Earl's wife, whereas appellant identifies herself as "Kathryn A. Lund." As the parties have nothing to say on this matter, we shall ignore it as well.

"~~1. Husband~~

"~~(a) 6014-6030 Gifford Avenue, Huntington Park, CA~~

"~~(b) 4601 E 58th Street, Maywood, CA~~

"~~(c) 218 Ogle Street, Costa Mesa, CA~~

"~~(d) 12 Wildwheat, Irvine, CA~~[5]

"B. <u>COMMUNITY PROPERTY</u>

"1. All ~~other of the~~[6] property, real and personal, of the parties hereto, whether title thereto is held in the names of one or the other of the parties or both of the parties as joint tenants or otherwise, is the community property of the parties hereto, each having a present, existing, and equal interest therein.

"2. Any checking/savings accounts and automobiles . . . shall be joint tenancy property and pass to the surviving joint tenant by right of survivorship.

"C. <u>CONVERTED PROPERTY</u>

"All of the property, real and personal, held in the name of Husband having its origin in his separate property no matter how received and/or earned, is hereby converted to community property of Husband and Wife, and shall thereafter be the community property of the parties for estate planning hereto, each having a present, existing, and equal interest therein.

"D. <u>EMPLOYEE BENEFITS</u> [¶] . . . [¶]

"E. <u>HEADING</u>[7]

"This Agreement is intended as a document of transfer for estate planning purposes to the extent necessary to conform the record ownership of the properties of the parties to the within Agreement. It is not intended by this

---

[5] The parties crossed out this portion of the agreement and initialed next to the change. Neither party contests the legitimacy of this alteration.

[6] The parties also crossed this phrase out and initialed next to this change; neither party contests the legitimacy of this alteration.

[7] The word "HEADING" is the actual heading for this section of the contract. The court and the parties speculated that this was merely a drafting oversight on the part of the drafting attorney.

Agreement to make any transfer of property between the parties hereto, nor shall this Agreement be construed for any purpose to affect any such transfer, but this Agreement is executed solely for the purpose of recognizing as between the parties the type of ownership of the properties acquired and now owned by them. In addition, the parties agree to join in the execution of such other deeds, assignments or documents as may be required to reflect the formal record ownership in accordance with this Agreement.

"F. ATTORNEY

"The parties hereto acknowledge the law firm of EDWARD H. STONE, A LAW CORPORATION, has acted as counsel for Husband and Wife for the preparation of the within Agreement, and each party states, that it understands and acknowledges that [Stone] has been asked by all parties to prepare this Agreement and all Exhibits and that the terms of this Agreement and Exhibits were concluded between the parties themselves . . . .

"G. BINDING [¶] . . . [¶]

"H. ENTIRE AGREEMENT: MODIFICATION

"This Agreement contains the entire understanding and agreement of the parties, and there have been no promises, representations, agreements, warranties, or undertakings by either party to the other, either oral or written, of any character or nature, except as set forth here. This Agreement may be altered, amended, or modified only by an instrument in writing, executed and acknowledged by the parties to the Agreement and by no other means. Each party waives the future right to claim, contend, or assert that this Agreement was modified, canceled, superseded, or changed by an oral agreement, course of conduct, or estoppel.

"I. APPLICABLE LAW

"This Agreement shall be governed in all respects by the laws of the State of California applicable to agreements executed and to be performed wholly within California. Nothing contained herein shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision contained herein and any present or future statute, law, ordinance or regulation contrary to which the parties have no right to contract, the latter shall prevail but the provision of this Agreement which is affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law. . . .

"J. SEVERABILITY

"If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions shall remain in full force and shall in no way be affected, impaired, or invalidated.

"K. CAPTIONS

"The captions of the various paragraphs in this Agreement are for convenience only, and none of them is intended to be any part of the text of this Agreement, nor intended to be referred to in construing any of the provisions of it. [¶] . . . [¶]

"I have carefully read and understand all of the provisions of the foregoing Agreement and approve of and agree to all of the terms hereof. [Signed Earl E. Lund, Jr. and Anne K. Lund.]"

*The Earl E. Lund, Jr. Trust*[8]

Earl established The Earl E. Lund, Jr. Trust (the Trust) in October 1990, several months after the parties married. On December 12, 2002, Earl and Kathryn amended and restated the Trust, such that both Earl and Kathryn became trustees and settlors of the Trust. The recitals to the amendment stated the Trust "is being amended to reflect the love and unity of Earl E. Lund, Jr. and Anne K. Lund. [¶] Earl E. Lund, Jr. considers Anne K. Lund to be an equal partner and to that end, Anne K. Lund in this amendment and restatement shall be deemed a Settlor as of October 18, 1990."

Three of the real properties at issue were transferred to Earl, as trustee of the Trust, prior to 2002, and in 2002 one of the properties was transferred to Earl and Kathryn, as trustees of the Trust. The Trust indicates with regard to property provided to the Trust, in relevant part: "The Settlors have transferred and delivered or will transfer and deliver to the Trustees, without consideration, the property described in Schedule A attached hereto, which is both separate and community property as more specifically designated herein. . . . [¶] The Settlors intend that all community property transferred to this Agreement and the proceeds thereof (the 'community estate') shall remain community property of the Settlors during their joint lifetimes. Similarly, the Settlors intend that all separate property and quasi-community property of either Settlor and the proceeds thereof (the 'separate estate') shall remain

---

[8] The trust is 218 pages long, and most of the text has no bearing on any of the issues in dispute. Thus, it would be both unnecessary and impractical to replicate the trust in the same manner as we have done with the Agreement to Establish Interest in Property.

separate property or quasi-community property during the joint lifetime of the Settlor-Owner. [¶] . . . It is the Settlors' intention that the Trustees shall have no more extensive power over any community property transferred to the Trust Estate than either of the Settlors would have had under Family Code Section 761 had this Agreement not been created and this Agreement shall be interpreted to so achieve this intention. This limitation shall terminate upon the death of either Settlor. . . . Any property in both names of the Settlors and transferred to a Trustee in this Agreement is deemed to be community property."

The Trust provides for its own undoing upon a dissolution of marriage: "Upon the filing of a petition for the dissolution of the marriage and/or separation by either Settlor, this Agreement is automatically terminated without further notice to third parties and either Trustee shall return to each Settlor the separate property they contributed to this Agreement not previously disposed of, together with each Settlor's share of the Trust Estate which is community property. Upon the automatic termination, all dispositive provisions of this Trust Agreement shall be null and void other than returning the assets to the rightful owners and each Settlor shall be deemed to have predeceased the other Settlor if the assets or property have not been returned to the proper owner prior to that Settlor's demise."

## The Parties' Wills

Both Kathryn and Earl executed wills on December 12, 2002. In sections of the wills relating to "no contest" clauses appearing in each will, the wills state: "For these purposes, my Estate Plan or Dispositive Plan includes but are not limited to this my Last Will and Testament, including all Codicils, my and my spouse's Trust, Agreement, any amendment, any amendment and restatement thereto, any lifetime gifts or transmutations, and any designation of beneficiary executed by me with respect to any and all life insurance policies, employee benefit plans, IRA's or other contractual arrangements." In sections of the wills concerning the "construction" of the wills with regard to the "no contest" clauses, the wills state: "[I]t is my intent that all of my estate planning documents ARE INTEGRATED so that if there is a breach, contest, violation or attack of one instrument, document or transfer of mine . . . then there is a breach, contest, violation or attack of any and/or all instruments, documents or transfers of mine as to that breaching, thwarting, contesting, violating or attacking party or entity."

## Trial of Bifurcated Issue

The court commenced proceedings in May 2006 to determine whether the Agreement to Establish Interest in Property transmuted Earl's separate property to community property. The court led off by expressing its uncertainty as

to interpreting the meaning of the contract: "[I]t seems like the issue as framed is if we assume . . . there are sufficient magic words [to transmute the separate property]" "a question arises . . . what does 'for estate planning purposes' mean? Does it mean that the parties are merely reciting the motivating reason behind this transmutation of property, or is it some sort of . . . King's X?" "I don't know whether Item (E) [in the Agreement to Establish Interest in Property] is something that [makes the contract] . . . ambiguous . . . ." The court invited the parties to call expert witnesses to assist the court in determining whether the repeated use of the phrase "for estate planning purposes" was intended as a term of art which would affect the overall meaning of the Agreement to Establish Interest in Property. The court further framed the issue for trial: "Here's what I don't know. If it's his separate property, can they for estate planning purposes . . . [and] for stepped-up [tax] basis, . . . say the magic words, 'for community property,' then it's community property, but for all other purposes it's not?"

The parties each called a qualified expert in the field of estate planning law. The experts discussed the tax advantages of community property vis-à-vis separate property upon the death of one spouse. Earl's expert discussed in detail the way in which the various "estate planning documents," which he defined to include the Agreement to Establish Interest in Property, would work together in the hypothetical event of the death of one of the parties had they remained married. The "estate plan" (the Trust, combined with the Agreement to Establish Interest in Property) provided tax benefits only if the couple was married when one died; thus, the Trust was revoked upon separation of the parties. Earl's expert opined that the Agreement to Establish Interest in Property "would be accepted by the IRS as transmuting the property into community property." But, in his opinion, the Internal Revenue Service's (IRS) acceptance of the document (in the hypothetical) does not equate to an actual transmutation occurring under California law; language in the agreement indicating it is for "estate planning purposes" and language in section E providing "[i]t is not intended by this Agreement to make any transfer of property between the parties hereto" negates the contrary indications that the agreement actually transmutes Earl's separate property as of December 2002.

The court issued a statement of decision on June 18, 2007. The statement of decision states in relevant part: "The court finds no effective transmutation occurred. The agreement is ambiguous, particularly when read in conjunction with the trust, and if it is not, the most reasonable construction of the documents is the parties objectively intended the agreement to change separate property to community property only if they were married when one spouse died." "In this case, the language [of the agreement] is certainly an express declaration connoting an intent to change respondent's separate property to community property." "But the court must not read that language

in a vacuum." "The agreement, the trust, and the wills were executed the same day. The parties' wills provide all of the estate planning documents are integrated. The court considers them as a whole." "Although the language 'convert' in the agreement is clear and unambiguous when read alone, other language [in the documents] is contrary to it, or at least makes the parties' objective intent ambiguous." "A party's intent to effect a transmutation must be unambiguous . . . . Taken together, . . . the estate planning documents create[] an ambiguity about what the parties intended." "Concerning the second issue, the court finds that even if the agreement effected a valid transmutation, it was the product of undue influence."

## DISCUSSION

*Transmutation of Property Interests*

■ The first issue before us is whether the court correctly interpreted the agreement in finding Earl had not unambiguously declared his intention to transmute his separate real properties to community property. "[M]arried persons may by agreement or transfer, with or without consideration, . . . [¶] . . . [¶] . . . [t]ransmute separate property of either spouse to community property." (§ 850.) "A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." (§ 852, subd. (a).) "[A] writing signed by the adversely affected spouse is not an 'express declaration' for the purposes of section [852, subdivision (a)] *unless* it contains language which expressly states that the characterization or ownership of the property is being changed." (*Estate of MacDonald* (1990) 51 Cal.3d 262, 272 [272 Cal.Rptr. 153, 794 P.2d 911].) Section 852, subdivision (a), does not "require[] use of the term 'transmutation' or any other particular locution." (*Estate of MacDonald*, at p. 273.) However, "[t]he express declaration must unambiguously indicate a change in character or ownership of property. [Citation.] A party does not 'slip into a transmutation by accident.'" (*In re Marriage of Starkman* (2005) 129 Cal.App.4th 659, 664 [28 Cal.Rptr.3d 639] (*Starkman*).)

■ "In deciding whether a transmutation has occurred, we interpret the written instruments independently, without resort to extrinsic evidence. [Citations.] Under the circumstances, we are not bound by the interpretation given to the written instruments by the trial court." (*Starkman, supra,* 129 Cal.App.4th at p. 664.)

The most factually similar California case to the instant one is *In re Marriage of Holtemann* (2008) 166 Cal.App.4th 1166 [83 Cal.Rptr.3d 385] (*Holtemann*), a case published after the court reached its decision in this case.

In *Holtemann*, a married couple executed a " 'Spousal Property Transmutation Agreement' " and a trust one year before their separation. (*Id.* at pp. 1169–1170.) An introductory provision in the transmutation agreement stated: " '[t]he parties are entering into this agreement in order to specify the character of their property interests pursuant to the applicable provisions of the California Family Code. This agreement is not made in contemplation of a separation or marital dissolution and is made solely for the purpose of interpreting how property shall be disposed of on the deaths of the parties.' " (*Ibid.*) The transmutation agreement, in its substantive provisions, stated: " 'Husband agrees that the character of the property [at issue] is hereby transmuted from his separate property to the community property of both parties.' " (*Id.* at p. 1170.) The transmutation explicitly referenced the trust, and the wife "acknowledge[d] that the transmutation of Husband's separate property into community property herewith was undertaken upon the express condition that the disposition of the trust estate of said Trust, upon the death of Husband and of Wife . . . shall remain in effect, and not be amended, modified or changed by Wife . . . ." (*Ibid.*)

The *Holtemann* court affirmed the trial court in finding an unambiguous transmutation occurred: "Regardless of the motivations underlying the documents, they contain the requisite express, unequivocal declarations of a present transmutation. Moreover, the documents reflect that [husband] was fully informed of the legal consequences of his actions." (*Holtemann, supra*, 166 Cal.App.4th at p. 1173.) "[W]e are not aware of any authority for the proposition that a transmutation, once effected, can be limited in purpose or otherwise rendered conditional or temporary. . . . In other words, [husband] wishes to have his cake and eat it too. He argues that, in the event of either his or [wife's] death, the survivor would be able to use the Transmutation Agreement to claim the property as community property, thus obtaining a full step up in basis to the fair market value of the property at date of death, while at the same time denying the validity of the Transmutation Agreement as an instrument which created community property." (*Id.* at p. 1174.) "We conclude, however, that his chosen language speaks to a contrary intent." (*Ibid.*)

*Interpretation of Agreement to Establish Interest in Property*

Interpreting the agreement at issue in this case as a whole, and analyzing it alongside *Holtemann, supra*, 166 Cal.App.4th at pages 1169–1174, we conclude that it unambiguously effects a transmutation of Earl's separate property into community property. Two substantive provisions of the agreement make clear all of the property previously held as Earl's separate property should be considered community property as of December 2002. Section B, part 1 states: "All property, real and personal, of the parties hereto, whether title thereto is held in the names of one or the other of the parties or both of

the parties as joint tenants or otherwise, is the community property of the parties hereto, each having a present, existing, and equal interest therein." Section C states: "All of the property, real and personal, held in the name of Husband having its origin in his separate property no matter how received and/or earned, *is hereby converted to community property* of Husband and Wife, and shall thereafter be the community property of the parties for estate planning hereto, *each having a present, existing, and equal interest therein.*" (Italics added.) Although the agreement does not use the word "transmutation," sections B and C clearly and unambiguously evidence an intent to transmute Earl's separate property into community property in December 2002.[9]

The parties' elimination of section A further confirms that the intent of the agreement was to transmute all of Earl's separate property, as this section identified Earl's real property as his separate property. By removing section A from the agreement, the parties manifested their intent to eliminate any potential argument that the real properties identified in section A were not subject to the transmutation provided for in section C.

The court was influenced in its interpretation of the agreement by language in the recitals and in section E of the agreement indicating the agreement was executed for "estate planning purposes," as well as by the existence of other "estate planning" documents (the Trust and the wills). But, as correctly stated in *Holtemann, supra,* 166 Cal.App.4th at page 1173, "the motivations underlying the documents" are irrelevant; the relevant question is whether "they contain the requisite express, unequivocal declarations of a present transmutation." It simply does not matter that the agreement, the Trust, and the wills were all executed together as part of a single "estate planning" strategy. The parties hotly dispute the question of whether we should interpret the agreement alone or in conjunction with all of the estate planning documents. But all the "estate planning" documents show is the parties had a comprehensive estate plan which would operate to provide the surviving party with tax benefits had the marriage survived until the death of the other party. The "estate planning" documents do not have any bearing on whether the

---

[9] Earl made a brief two-sentence argument in his brief, repeated again at oral argument, to the effect that section C operates *only* on property held "in the name of [Earl]." He asserts that none of the disputed property was held in his name, but rather "in the name of a trust." This argument is sophistry. The deeds in evidence establish that the properties were held in Earl's name "as Trustee." This is as it must be, because "a trust is not a person but rather 'a fiduciary *relationship* with respect to property.' [Citations.] Indeed, ' " 'an ordinary express trust is not an entity separate from its trustees.' " ' " (*Moeller v. Superior Court* (1997) 16 Cal.4th 1124, 1132, fn. 3 [69 Cal.Rptr.2d 317, 947 P.2d 279].) Thus, Earl held the property *in his name*, but subject to his obligations as trustee under the terms of the Trust. Property cannot be held "in the name" of an express trust.

agreement at issue contains the "requisite express, unequivocal declarations of a present transmutation." (*Holtemann, supra*, 166 Cal.App.4th at p. 1173.)

There is one important textual difference between the document interpreted in *Holtemann* and the agreement before us. In section E of the agreement here, it states: "It is not intended by this Agreement to make any transfer of property between the parties hereto, nor shall this Agreement be construed for any purpose to affect any such transfer, but this Agreement is executed solely for the purpose of recognizing as between the parties the type of ownership of the properties acquired and now owned by them. In addition, the parties agree to join in the execution of such other deeds, assignments or documents as may be required to reflect the formal record ownership in accordance with this Agreement." Earl argues (and the court below agreed): (1) section E creates ambiguity as to Earl's intent to transmute his previously separate property, and therefore no transmutation occurred because there is not an unequivocal declaration; (2) taking section E into consideration, if there is an unambiguous meaning of the contract, it must be that Earl did not actually intend to transmute the property but only intended to execute a document capable of convincing the IRS that a transmutation had occurred; and (3) there is no evidence in the record indicating the parties executed other documents to bring formal record ownership into accordance with the agreement, and thus the parties must not have meant to transmute the separate properties.

We disagree with each contention. Interpreting section E to simply undo or call into question the work done by sections B and C violates basic principles of contract interpretation. (Civ. Code, §§ 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."], 1643 ["A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties."], 3541 ["An interpretation which gives effect is preferred to one which makes void."].) Sections B and C clearly transmute Earl's separate property into community property; if at all possible, section E should be interpreted to be consistent with sections B and C. This can be accomplished by interpreting the contract as suggested by Kathryn. The agreement was not a deed. It was *an agreement* to transmute Earl's separate property to community property. (See § 850 [married persons may transmute separate property to community property *"by agreement or transfer"* (italics added)].) The agreement transmutes Earl's separate property to community property, but it does not "transfer" title of the real property at issue.

Reduced to its essentials, Earl's argument, if accepted, would interpret the agreement as effecting a transmutation of his separate property to

community property only if he or Kathryn died while married. But the language of the agreement clearly disclaims the notion of a conditional future transmutation. "All of the property, real and personal, held in the name of Husband having its origin in his separate property no matter how received and/or earned, *is hereby converted to community property* of Husband and Wife, and shall thereafter be the community property of the parties for estate planning hereto, *each having a present, existing, and equal interest therein.*" (Italics added.) A "present, existing, and equal interest" is the antithesis of a "conditional future transmutation." We suggest that only persons over-schooled in the law could read this clear language to find an ambiguity where none exists. Persons unschooled in the law would read this language to mean exactly what it says. And the termination provision in the Trust, whereby the Trust is automatically revoked upon filing of a petition for dissolution of marriage, cannot be interpreted as automatically retransmuting the property upon the filing of a dissolution petition. "Community property, including any income or appreciation, that is distributed or withdrawn from a trust by revocation, power of withdrawal, or otherwise, remains community property unless there is a valid transmutation of the property *at the time of distribution or withdrawal.*" (§ 761, subd. (b), italics added.)

Moreover, the notion that parties may execute a "conditional" transmutation (or, as colorfully described by the court, cross their fingers while signing the agreement) was rejected by *Holtemann, supra,* 166 Cal.App.4th at pages 1173–1174. The transmutation either occurred in December 2002 (as we find it did) or it did not. We also note that interpreting the contract as a mere tax strategy and not an effective transmutation (i.e., the agreement would serve as documentary support for a representation to the IRS that a transmutation occurred notwithstanding the lack of an actual transmutation) seems to contravene section I of the agreement, which states: "Nothing contained herein shall be construed so as to require the commission of any act contrary to law . . . ." We will not assume the parties intended to execute the agreement for the sole purpose of providing documentary support to a future materially false representation to the IRS.

■ Finally, the lack of evidence of additional deeds, assignments, or other documents reflecting community property ownership of the property at issue does not affect the interpretation of the other provisions of the agreement. Three of the properties at issue had been transferred to Earl as trustee before the December 2002 amendment and restatement of the Trust, and the fourth property was transferred to Earl and Kathryn as trustees. We will not speculate as to whether Earl was required under the agreement to execute a deed reflecting community property ownership of his previously separate real properties. Even if Earl had been required to execute additional documents, a party's alleged failure to meet executory obligations under a contract does not affect the meaning of other provisions in the contract.

*Undue Influence*

The court also supported its judgment on the alternate ground that any attempt at transmutation was invalid due to Kathryn's failure to rebut the presumption of undue influence attaching to the transaction. Kathryn argues on appeal the court's finding lacks substantial evidence.

■ Spouses "may enter into any transaction with the other, or with any other person, respecting property, which either might if unmarried." (§ 721, subd. (a).) "[I]n transactions between themselves, a husband and wife are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other. This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners . . . ." (§ 721, subd. (b).)

"When an interspousal transaction advantages one spouse, '[t]he law, from considerations of public policy, presumes such transactions to have been induced by undue influence.' [Citation.] 'Courts of equity . . . view gifts and contracts which are made or take place between parties occupying confidential relations with a jealous eye.' " (*In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 293–294 [39 Cal.Rptr.2d 673].) "Thus, the requirements of section 852 are prerequisites to a valid transmutation but do not necessarily in and of themselves determine whether a valid transmutation has occurred." (*In re Marriage of Barneson* (1999) 69 Cal.App.4th 583, 588 [81 Cal.Rptr.2d 726].)

"When a presumption of undue influence applies to a transaction, the spouse who was advantaged by the transaction must establish that the disadvantaged spouse's action 'was freely and voluntarily made, with full knowledge of all the facts, and with a complete understanding of the effect of' the transaction." (*In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 738–739 [43 Cal.Rptr.3d 181].) "The question 'whether the spouse gaining an advantage has overcome the presumption of undue influence is a question for the trier of fact, whose decision will not be reversed on appeal if supported by substantial evidence.' " (*Id.* at p. 737.)

The only issue before us is whether the court's finding of fact—that Kathryn did not rebut the presumption of undue influence—is supported by

substantial evidence.[10] The following are the relevant findings by the court in its statement of decision: "[T]he court concludes by a preponderance of the evidence [Earl] entered into the agreement freely and voluntarily with a full understanding of the pertinent facts. Attorney Stone, who drafted the agreement, was the attorney for both parties. The court infers Stone advised respondent of the implications of the agreement, inquired whether he was entering into the agreement freely and voluntarily, and would not have allowed the document to be executed if [Earl] gave other than an affirmative answer. [¶] The proof problem lies with whether [Earl] had 'a complete understanding of the effect of the [agreement].' [Citation.] As the analysis in this statement of decision suggests, the language in the agreement presents an extremely tough legal question concerning its effect. [¶] It is extremely unlikely respondent, a lay person, could figure it out on his own, and the court cannot conclude it is more likely than not attorney Stone told [Earl] his separate property transmuted into community property as of the date the parties signed the agreement and a later divorce would have no effect on that fact. [Kathryn] failed to meet her burden to rebut the presumption of undue influence as it is defined concerning interspousal transactions."

In essence, the court found Kathryn successfully demonstrated Earl entered the transaction voluntarily with an understanding of all relevant facts, but failed to rebut the presumption that Earl did not understand the *legal* effect of the transaction. The court's finding is based in part on a lack of evidence in the record: Neither Earl nor the attorney who drafted the agreement (Stone) testified at the trial, and Kathryn (the only percipient witness to testify) did not testify as to whether the legal import of the agreement was explained to her and Earl. The court also based its ruling on the perceived complexity of the agreement, which led the court to its conclusion that Earl was unlikely to have understood its legal ramifications.

The court's ruling lacked substantial evidence. Just above Earl's signature in the agreement is the following statement: "I have carefully read and understand all of the provisions of the foregoing Agreement and approve of and agree to all of the terms hereof." The agreement is only five pages long, including the signature page. And, as detailed above, the court wrongly interpreted the agreement to include ambiguity. Earl's attestation to his understanding of the agreement served to rebut the presumption that he did not understand the legal import of the agreement. There is no other evidence in the record to weigh, as none of the testimony goes to Earl's understanding of the legal effect of the agreement.

---

[10] Kathryn does not argue on appeal that she did not obtain an advantage over Earl by way of the agreement or that the presumption of undue influence was inapplicable to the transaction at issue. Nor does Kathryn argue on appeal that the court should not have reached the issue of undue influence as part of its inquiry into the bifurcated issue of whether a transmutation occurred.

## DISPOSITION

██ Because we disagree with the court's interpretation of the agreement at issue and because substantial evidence does not support the court's factual finding as to undue influence, we reverse the judgment on the bifurcated issue of whether Earl's separate property was transmuted into community property. We grant Kathryn's motion to augment the record on appeal pursuant to California Rules of Court, rule 8.155. Kathryn shall recover her costs on appeal.

O'Leary, Acting P. J., and Aronson, J., concurred.