Filed 4/30/13  Marriage of Ramirez-Mitchell and Mitchell CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| In re the Marriage of CHRISTINA MARIA RAMIREZ-MITCHELL and MURIEL E. MITCHELL. | A135303 |
| CHRISTINA MARIA RAMIREZ-MITCHELL, Appellant, v. MURIEL E. MITCHELL, Respondent. | (Alameda County Super. Ct. No. RF09480342) |

During the marriage of Muriel E. Mitchell and Christina Maria Ramirez-Mitchell, Muriel executed a deed transmuting the home they occupied from his separate property to her separate property.[1]  In a related agreement, he was granted a right of lifetime occupancy of the home, and Christina's rights of transfer and devise were strictly limited. At dissolution of the marriage, Muriel contended the deed and agreement did not effect a transmutation.  The family court agreed, declaring the property to be Muriel's separate property and directing Christina to reconvey the residence to Muriel.  We reverse this aspect of the family court's judgment.

---

[1] For clarity, we refer to the parties by their first names.  We mean no disrespect in adopting this convention.

# I.  BACKGROUND

Christina filed a petition for dissolution of her 11-year marriage to Muriel in October 2009.  At the time of trial in 2011, Muriel was a 77-year-old retiree living on veterans' and Social Security payments.  Christina was 60 years old and working part-time as a preschool teacher.

The only issue raised on appeal is the proper characterization of a Berkeley residence (the property).  When the couple married, Muriel owned the property free and clear.  On May 20, 2003, he executed an interspousal transfer deed (the deed) that purported to "GRANT[] and TRANSMUTE[]" the property to Christina as her "sole and separate property."  In the deed, Muriel retained a "lifetime personal right of occupancy" in the property pursuant to a separate "Agreement Regarding Occupancy and Will" between the parties (the agreement).

The agreement was executed contemporaneously with the deed.  A recital in the agreement stated that Muriel was transferring the property to Christina "because of deteriorating health, and, among other things," to allow Christina "to be able to manage [the property] in the event [Muriel] is no longer capable of participating in transactions involving [the property]."  In addition, Muriel intended by the transfer to avoid probate of the property.[2]  Under the terms of the agreement, Muriel granted his interest in the property to Christina as her separate property.  He retained a lifetime right to occupy the property, although Christina was granted a limited right to lease it if Muriel was admitted to long-term nursing care.  Christina was precluded from selling or transferring the property during Muriel's lifetime to any person other than Muriel's descendants.  At Muriel's death, the restraints on Christina's use of the property during her life were removed, but she was required to devise the property, or the cash equivalent, to Muriel's descendants pursuant to a quoted provision in her will.

---

[2] As discussed below, the testimony at the trial suggested these were not the actual, or at least not the primary, reasons for the transaction.

A trial was held in June 2011, regarding the circumstances of the transaction.[3] The attorney who prepared the deed and agreement, John Frederick Clarke, Jr., testified that Muriel and Christina were referred to him by an advocacy group and retained him for the "sole purpose" of protecting the property from claims by Medi-Cal. At the time, Muriel was undergoing cancer treatment. Although he was eligible for veterans' health benefits, under certain circumstances he could become liable to Medi-Cal for the cost of nursing home care, and the couple was concerned claims for reimbursement of these benefits would "adversely affect Muriel's children." As Clarke explained, the "primary beneficar[ies]" of the transaction were Muriel's descendants, rather than Christina, since the property would be insulated from Medi-Cal reimbursement claims for so long as Christina lived in it. Prior to the execution of the transaction documents, Clarke sent Christina and Muriel a letter reflecting the proposed terms of the transaction, which both of them countersigned. The letter confirmed that Muriel has "decided to gift the title to his residence to Christina" to avoid claims for reimbursement of Medi-Cal benefits, with Muriel retaining a right of occupancy. Clarke said Muriel "seem[ed] to understand the nature of the work" and was not confused "at all" about "what was happening."

In 2007, Clarke said, the agreement was amended to designate a different devisee for the property from among Muriel's descendants as a result of a change in his "testamentary wishes." Not only was Clarke persuaded Muriel understood the nature of the amendment, but he said it was done at Muriel's "instigat[ion]."

Christina testified that, at the time the documents were executed, Muriel had been diagnosed with cancer but was mentally sound. His treating physicians at the veterans' hospital had encouraged him "to put things in order" and were "concerned because of the way the [Veterans Health Administration] system was releasing the older veterans." In addition, one of Muriel's adult children "wanted me the hell out of her house when I'm 62 if [Muriel] got too sick or was in the hospital," and the transaction was intended "to

---

[3] Evidence was also taken with respect to a few other issues in dispute between the parties, but the resolution of these issues has not been challenged on appeal.

3

protect me" from the children. Christina said that when she and Muriel planned the transaction with the lawyer, Muriel understood the nature of the discussions and the documents. She explained the 2007 amendment was executed after a family dispute caused Muriel to change his mind as to which of his descendants should inherit the property. Christina accepted the change at Muriel's request.

Muriel testified that, as a result of a "real bad" case of "PTSD," he had trouble with his memory. At the time he met with Clarke, Muriel was suffering from a number of debilitating conditions, including cancer, and was being treated with a variety of medications, which caused him to fall asleep if he sat still. He did recall consulting Clarke at the behest of his children, who were concerned that "when [he] died, [Christina] was going to kick them out on the streets." Muriel hoped to prevent that by allowing Christina to live in the property after his death while requiring her to bequeath it to his children. He did not recall executing the various documents prepared by Clarke, but he acknowledged the authenticity of his signatures on them.

In a detailed statement of decision, the court declined to find a transmutation of the property, ruling, "reading all the [transaction documents] as a whole, the Court finds that [Muriel] did not intend to change the ownership and characterization of [the property] from himself to [Christina].[4] The Court also finds that [Christina], based on the writings alluded to above which are in evidence, had no expectation that she was the 'owner' of [the property]. [¶] All writings in evidence pertaining to the characterization of [the property] maintain[] most rights of ownership in [Muriel], including, but not limited to, occupancy, control over whom the property can be transferred to, and whom the property can be devised to. All writings pertaining to the characterization of [the property] clearly indicate that the parties had a plan to insulate [the property] from Medi-Cal claims and lack[ed] an express intent to change ownership of the property to

_____

[4] The documents listed by the family court are the deed, the agreement, the countersigned letter written to the couple by Clarke describing the transaction, and the 2007 amendment to the agreement.

[Christina]." Accordingly, the court declared the property to be Muriel's separate property and ordered Christina to reconvey the property to him.

## II. DISCUSSION

Christina contends the family court erred in finding no transmutation of the property to her separate property.

The law relating to spousal transmutations of property was well summarized in *In re Marriage of Lund* (2009) 174 Cal.App.4th 40 (*Lund*):

" '[M]arried persons may by agreement or transfer, with or without consideration, . . . [¶] . . . [¶] . . . [t]ransmute separate property of either spouse to community property.' ([Fam. Code,] § 850.) 'A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected.' (§ 852, subd. (a).) '[A] writing signed by the adversely affected spouse is not an "express declaration" for the purposes of section [852, subdivision (a)] *unless* it contains language which expressly states that the characterization or ownership of the property is being changed.' [Citation.] Section 852, subdivision (a), does not 'require[] use of the term "transmutation" or any other particular locution.' [Citation.] However, '[t]he express declaration must unambiguously indicate a change in character or ownership of property. [Citation.] A party does not "slip into a transmutation by accident." ' [Citation.]

" 'In deciding whether a transmutation has occurred, we interpret the written instruments independently, without resort to extrinsic evidence. [Citations.] Under the circumstances, we are not bound by the interpretation given to the written instruments by the trial court.' " (*Lund, supra,* 174 Cal.App.4th at p. 50.)

We conclude the family court's finding of no transmutation was in error for at least three separate and independent reasons.

First, the various transaction documents satisfied the statutory requirement of an express and unambiguous written declaration of a change in the character of the property, signed by Muriel, and the court was required to give effect to this language. The first such declaration was the deed, which stated in no uncertain terms, "MURIEL E.

MITCHELL, a married man ("GRANTOR"), hereby FOREVER GRANTS and TRANSMUTES to his wife, CHRISTINA RAMIREZ-MITCHELL, a married woman ("GRANTEE"), as her sole and separate property, all of GRANTOR'S right, title and interest in and to [the property]." A clearer statement of intent could not be given. There is no dispute that the real property referred to in the deed is the property, nor is there any dispute about the authenticity of Muriel's signature, which he acknowledged at trial. If that were not enough, the agreement also states, "[Muriel] concurrently with this agreement grants [Muriel's] interest in [the property] to [Christina] as [Christina's] sole and separate property." Finally, the letter from Clarke to the couple, which both countersigned as "[r]ead, understood, and agreed," states, "Muriel has decided to gift the title to his residence to Christina . . . ." Any one of these alone likely would require the finding of a transmutation. Together they are irrefutable.

Virtually indistinguishable is *In re Marriage of Holtemann* (2008) 166 Cal.App.4th 1166. As part of their estate plan, the *Holtemann* couple entered into an agreement under which certain items of the husband's real and personal property were transmuted to community property. An irrevocable trust agreement executed by the parties confirmed the transmutation. (*Id.* at pp. 1169–1170.) In response to the husband's argument that the transmutation agreement should not be enforced because it was intended to implement an estate plan, rather than a dissolution, the court held, "The Transmutation Agreement and Trust at issue in this case establish that [the husband] intended to, and did, transmute from separate to community property that which was identified in the incorporated exhibit. The Transmutation Agreement unambiguously states that 'Husband agrees that the character of the property described in Exhibit A (including any future rents, issues, profits, and proceeds of that property) *is hereby transmuted from his separate property to the community property of both parties*.' (Italics added.) . . . As the trial court aptly noted, '[a] clearer statement of a transmutation is difficult to imagine.' [¶] . . . [¶] . . . Regardless of the motivations underlying the documents, they contain the requisite express, unequivocal declarations of a present transmutation." (*Id.* at pp. 1172–1173.) As a result, the court upheld the transmutation.

6

The same logic was applied in *Lund,* to reject an argument similar to the "intent" argument raised here: " '[T]he motivations underlying the documents' are irrelevant; the relevant question is whether 'they contain the requisite express, unequivocal declarations of a present transmutation.' It simply does not matter that the agreement, the Trust, and the wills were all executed together as part of a single 'estate planning' strategy. . . . [A]ll the 'estate planning' documents show is the parties had a comprehensive estate plan which would operate to provide the surviving party with tax benefits had the marriage survived until the death of the other party. The 'estate planning' documents do not have any bearing on whether the agreement at issue contains the 'requisite express, unequivocal declarations of a present transmutation.' " (*Lund, supra,* 174 Cal.App.4th at pp. 52–53.) Again, the *Lund* court enforced an unequivocal declaration of transmutation. Because the deed and agreement were executed by Muriel and contain " 'express, unequivocal declarations of a present transmutation,' " the transmutation to Christina's separate property must be given effect.

Second, the transaction documents contained a deed by which Muriel granted the property to Christina. The terms of an unambiguous deed cannot be contradicted by parol evidence. (*French v. Brinkman* (1963) 60 Cal.2d 547, 552 [" 'if the language of a deed is plain, certain and unambiguous, neither parol evidence nor surrounding facts and circumstances will be considered to add to, detract from, or vary its terms or to determine the estate conveyed' "]; *Scruby v. Vintage Grapevine, Inc.* (1995) 37 Cal.App.4th 697, 702 [same].) The family court's invocation of the various transaction documents to contradict the plain and unambiguous terms of the deed violated this fundamental principle, effectively invalidating the deed without any evidence of a recognized defense to its enforcement.[5]

_____

[5] There was testimony at the trial about Muriel's understanding of the terms of the transaction. According to Christina and Clarke, Muriel understood the transaction perfectly well. In fact, it was undertaken at his behest to benefit his descendants. Muriel did not effectively contradict this characterization, since, as he acknowledged, he could not clearly remember what happened. Accordingly, there was no evidentiary basis for a

7

Third, the family court erred in concluding the transaction documents reflect an "intent" not to work a change in title. As stated above, three separate transaction documents plainly state Muriel is transmuting his interest in the property to Christina's separate property. Because the intent of the parties to an agreement is determined objectively, by the plain meaning of unambiguous terms, Muriel and Christina must be deemed to have intended what they clearly said they intended in the transaction documents. (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321 [" 'If contractual language is clear and explicit, it governs.' "].) Moreover, a transmutation in the character of the property was central to the success of the transaction. The testimony at the trial demonstrated three separate purposes for the transaction: to guarantee the property would eventually be inherited by Muriel's descendants, to ensure Christina would not be evicted from the property by Muriel's descendants during her lifetime, and to protect the property, upon Muriel's death, from any claims by the state for reimbursement of his medical expenses. Without a transmutation, all three objectives would be frustrated. If Muriel retained his separate property interest in the property, it could be seized by the state to reimburse medical expenses upon Christina's death and might not be inherited by his descendants.[6] Alternatively, if the property was not seized by the state—for example, because Muriel did not incur Medi-Cal expenses—without the transmutation it would have been inherited by his descendants, who could then evict Christina.

Further, the agreement would have been pointless without a transmutation. If the property was not transmuted to Christina's separate property, there would be no need for her to agree to leave it to Muriel's descendants; as owner, he would have determined its disposition. Nor would Muriel be required to reserve a lifetime right of occupancy in the

finding of lack of capacity, undue influence (see *In re Marriage of Delaney* (2003) 111 Cal.App.4th 991, 999–1000), or duress, and the family court made no such finding.

[6] For this reason, the court's finding "that the parties had a plan to insulate [the property] from Medi-Cal claims and lack[ed] an express intent to change ownership of the property to [Christina]" is irremediably in conflict. The former intent could not be served while maintaining the latter.

property without a transmutation, since as owner he would be entitled to exercise all rights in the property. Nor, for the same reason, would the various restrictions on Christina's disposition of the property during her lifetime have been necessary in the absence of a transmutation. By finding no transmutation, the family court rendered the agreement a vain exercise.

The family court appears to have reasoned Muriel did not intend to transmute the property because he retained certain rights of ownership through the agreement. As the court explained, "All writings in evidence pertaining to the characterization of [the property] maintain[] most rights of ownership in [Muriel], including, but not limited to, occupancy, control over whom the property can be transferred to, and whom the property can be devised to." Even assuming this could justify ignoring the plain language of the various documents regarding characterization, it is not an accurate understanding of the transaction. While Muriel did retain the right of occupancy, he did not retain control over the inter vivos or testamentary transfers. It is true Christina's rights of inter vivos and testamentary transfer were strictly limited by the agreement, but she nonetheless possessed the rights. As the amendment to the agreement illustrated, Muriel had no control over the descendants to whom the property would be devised without Christina's consent.

### III. DISPOSITION

That portion of the judgment of dissolution declaring the property to be Muriel's separate property and directing Christina to reconvey the property to Muriel is reversed. The matter is remanded for further proceedings consistent with this decision, including a determination of any rights Muriel may have under the agreement and entry of an amended judgment.

9

                                            _____
                                            Margulies, Acting P.J.

We concur:

_____
Dondero, J.

_____
Banke, J.