Filed 6/14/22  Marriage of Barlow CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re Marriage of ANTHONY and VERNITA BARLOW. | B314391<br><br>(Los Angeles County<br>Super. Ct. No. BD641061) |
| ANTHONY BARLOW,<br><br>    Appellant,<br><br>    v.<br><br>VERNITA BARLOW,<br><br>    Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Christine Byrd, Judge.  Affirmed.

Frazee Law Group and RoseAnn Frazee for Appellant.

No appearance for Respondent.

————————————————

Anthony Barlow appeals from the judgment in this marital dissolution action, contending the family court erred in finding certain real property was Vernita Barlow's separate property rather than community property.  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The Sylvan Street Property*

In 2000 Vernita[1] acquired title to a house on Sylvan Street in Van Nuys, California.  Vernita did not live in the house, nor did she pay any of the purchase price for the home or make payments on the home loan secured by a deed of trust on the property.  Vernita had allowed the property to be taken in her name—and had presumably signed a promissory note and deed of trust encumbering the property to obtain a home loan—on behalf of her friend who had poor credit and could not qualify for a home loan herself.[2]  The friend lived in the house and initially made the payments on the home loan.

By the time Vernita and Anthony began dating, Vernita's friend had ceased making payments on the home loan, and the lender had initiated foreclosure proceedings.  Although the house had fallen into disrepair, Anthony told Vernita he could renovate it and they could live in it.  Vernita agreed and borrowed money

---

[1]     As customary in family law matters, we refer to the parties by their first names for clarity.

[2]     The record does not contain the deed granting Vernita her initial interest in the home or any loan documents.  Vernita testified at trial that she "used [her] credit and signed . . . the mortgage for [her] friend."  Regardless of the legal mechanism by which Vernita took title, the parties agree Vernita owned the home prior to the marriage.

from her father to avoid foreclosure.  She evicted her friend, and she and Anthony moved into the home.  They were subsequently married in November 2002.

### 2. *The 2004 and 2014 Grant Deeds*

On June 29, 2004 Vernita executed a deed granting the Sylvan property to "Anthony Barlow and Vernita Barlow, husband and wife, as joint tenants."  The deed was never recorded.

In December 2014 Anthony and Vernita refinanced the loan, resulting in a new loan secured by a deed of trust on the property and the execution and recording of a new grant deed.  The deed executed during that transaction is not in the record.  However, the uniform residential loan application, completed by Vernita and Anthony as co-borrowers, indicated title would be held by Vernita and Anthony in a manner "to be determined in escrow."  The parties agree the deed that was ultimately recorded in late 2014 or early 2015 listed them as joint owners of the property.  The refinance transaction also included a cash disbursement of $129,037.15, which was paid by check, dated January 2, 2015, to Anthony and Vernita as payees.

### 3. *The Petition for Dissolution*

The parties separated in March 2015, and Anthony filed a petition for dissolution of the marriage on May 24, 2016.  In his separate property declaration filed contemporaneously with the petition, Anthony claimed a 50 percent interest in the Sylvan property.  Vernita contested the characterization of the Sylvan property as community property, arguing the 2004 and 2014 deeds were unenforceable because procured through undue influence.

3

4. *Evidence at Trial*

The court heard testimony on the circumstances surrounding the 2004 and 2014 grant deeds over two days in March 2021.  Anthony testified he had been a real estate broker and had a passion for renovating houses.  He was excited to move into the Sylvan property in 2002 and begin renovations.  He explained he made one loan payment in September 2002, prior to the marriage, so that Vernita would know he was serious about renovating the house.  He also used his separate funds to partially pay back Vernita's father for the loan that had enabled Vernita to terminate foreclosure proceedings.  Anthony also claimed he had contributed almost $60,000 of his separate funds to the renovations between 2003 and 2013.

Anthony testified he handled the couple's finances once they were married.  According to Anthony, prior to their marriage, Anthony and Vernita had opened a joint bank account to which they both contributed.  However, Anthony stated Vernita did not deposit her entire paycheck into the joint account.  He said Vernita was very private about her finances and he did not know how much money she made.

At some point in 2002 or 2003 Anthony discovered Vernita had been making large donations to her church.  When Vernita refused to disclose the exact amounts or timing of the donations, Anthony contacted the church's pastor and told him, "'If you did not tell me what my wife was giving to the church, that I would be down there Sunday, not in a violent way, but I would let everybody in the church know that we're not adhering to the Word,' meaning the Bible, because we are as one if we're married.  And I should be able to know what my wife is giving to the church."  At another point early in the marriage, Anthony

4

discovered $65,000 missing from a bank account. Vernita told him she had given it away. Anthony estimated Vernita donated "hundreds of thousands of dollars" to religious organizations over the course of the marriage.

In 2004, because of what he called the "financial infidelities" of Vernita's donations, Anthony became concerned Vernita "would give the house away or sell it under me." Anthony decided to have Vernita execute the 2004 grant deed giving him an interest in the property "to stop her from giving the house away." He testified that the deed "was a tool that if she did give the house away, if there was a problem with the house, I could at least have something in writing." Anthony never recorded the deed.

As to the 2014 grant deed, Anthony testified there were multiple reasons the couple wanted to refinance the home loan and take a cash disbursement from the loan proceeds. He stated, "Vernita had undergraduate loans as well as a car loan, I wanted to get a new car, and my mom was sick. Also, the most important, Vernita wanted to make me whole because I had moved out of the master bedroom into the guest suite because I was so upset over the continuous giving away of our money. So this was a way to make me whole."

Anthony presented copies of two cashier's checks purchased by him on January 14, 2015, one payable to Vernita for $15,000 and the other payable to Toyota Financial for approximately $10,000. Anthony explained these funds came from the refinance proceeds. The check to Vernita was to be used by her to pay off her student loans, and the check to Toyota was to pay the balance on Vernita's car loan. Anthony also presented a copy of a third cashier's check purchased by him on January 14, 2015 for

$100,000 payable to Anthony.  He testified Vernita agreed to give him $100,000 from the refinance proceeds as "a way to make me whole to make me feel as though she's not using me.  Because I kept telling her I feel like I'm being used here."  Anthony deposited $8,000 into his and Vernita's joint account and used the remaining funds to buy a car, go on vacation, pay off his credit cards and pay his rent after he moved out of the Sylvan property in March 2015.

Anthony testified Vernita voluntarily agreed to execute the 2004 deed and 2014 deed and denied ever bullying or coercing her.

Vernita disputed Anthony's account of the circumstances surrounding the grant deeds.  While Vernita confirmed she regularly donated money to religious organizations throughout the marriage, she testified the donations were not the only motivation for the 2004 grant deed.  Vernita explained that Anthony proposed the grant deed after learning she had deposited $20,000 from the 2003 refinance of the home loan into her separate bank account.  She stated, "Once Anthony found out, he was very, very, very upset.  And he—he said that he could—he had people he knew who could . . . have me not be found.  Put me where I could not be found."  Based in part on this threat, Vernita felt she had to sign the 2004 deed to assure Anthony "that I was not trying to do anything that was negative regarding our relationship."  However, Vernita stated it was not her intention to transfer an interest in the property to Anthony.  She believed the deed was not effective unless recorded, and Anthony told her he would not record it unless she "gave him a reason" to do so.  Vernita understood that "[i]f I did anything that he did not want me to do or like for me to do, then he would have

reason to record the deed." Vernita further stated she trusted Anthony because he was knowledgeable about real estate and finances, whereas she was not.

Regarding the 2014 refinance, Vernita testified her understanding had been they would use the proceeds to purchase another property. Vernita did not learn that Anthony had withdrawn $100,000 of the loan proceeds from their bank account until he had moved out of the marital home in March 2015. She denied there had been an agreement Anthony would receive $100,000 to compensate him for the charitable donations Vernita had made during the marriage. When she learned he had taken the money, Vernita felt she had been misled about the purpose of the refinance.

5. *The Family Court's Ruling*

In its April 29, 2021 statement of decision, the family court found, in order to change the Sylvan property from Vernita's separate property to community property, Vernita would have had to execute a transmutation agreement pursuant to Family Code section 852.[3] Such an agreement, the court explained, was subject to the presumption of undue influence that arises from certain transactions between spouses. Crediting Vernita's account of the circumstances surrounding the 2004 and 2014 grant deeds, the court found Anthony exerted undue influence over Vernita to persuade her to execute the deeds. Accordingly, the court found Anthony had failed to carry his burden to rebut the presumption of undue influence by a preponderance of the evidence and the Sylvan property remained Vernita's separate

---

[3] Statutory references are to this code unless otherwise stated.

property.  In the alternative, the court found, to the extent Evidence Code section 662 applied to the 2014 grant deed, the presumption of record title was rebutted by clear and convincing evidence of undue influence.  The court further found Vernita was entitled to reimbursement of the $100,000 in loan proceeds Anthony withdrew from their bank account because the funds represented equity from Vernita's separate property.

The court also made specific findings as to Anthony's credibility, stating his testimony "was inconsistent and mostly unsupported by documentation or any written evidence and generally lacked credibility."  The court continued, "[Anthony's] demeanor while testifying also undermined his credibility.  He provided lengthy testimony but actively avoided providing direct answers to key questions.  His forceful and confident manner contrasted with the complete lack of supporting documentation for most of his testimony."

In addition to ruling the Sylvan property was Vernita's separate property, the court denied Anthony's request for reimbursement of funds he allegedly spent improving the property, denied Vernita's request for spousal support, ordered Anthony to pay spousal support arrearages ordered in 2019, provided the parties were to retain their own retirement plans, and denied the parties' requests for attorney fees.

The judgment of dissolution was entered on June 10, 2021.

## DISCUSSION

1. *Governing Law and Standard of Review*

"As a general rule, property that is acquired prior to marriage is the separate property of the acquiring spouse."  (*In re Marriage of Wozniak* (2020) 59 Cal.App.5th 120, 129; see § 770,

subd. (a)(1).)  On the other hand, all property acquired in joint form during marriage is presumed to be community property. (§ 2581 ["property acquired by the parties during marriage in joint form, including property held in tenancy in common, joint tenancy, or tenancy by the entirety, or as community property, is presumed to be community property"]; see also § 760 ["[e]xcept as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property"]; *Wozniak*, at p. 129.)

"Married persons may, through a transfer or an agreement, transmute—that is, change—the character of property from community to separate or from separate to community."  (*In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1400; see also § 850.)  A transmutation of property, however, "is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected."  (§ 852, subd. (a).)  To be effective the writing "must expressly state that the character or ownership of the property at issue is being changed."  (*Valli*, at p. 1400; accord, *In re Marriage of Lund* (2009) 174 Cal.App.4th 40, 50 ["'[T]he express declaration must unambiguously indicate a change in character or ownership of property.  [Citation.]  A party does not "slip into a transmutation by accident"'"].)

As with any other interspousal transaction, spouses entering a transmutation agreement have a fiduciary relationship with one another and must act according to the highest duty of good faith and fair dealing:  With certain exceptions not relevant here, "in transactions between themselves, spouses are subject to the general rules governing

fiduciary relationships that control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other." (§ 721, subd. (b).)

As a consequence of the fiduciary duties imposed by section 721, a presumption of undue influence attaches to certain agreements between the parties. (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 27 ["[t]he primary consequences of designating a relationship as fiduciary in nature are that the parties owe a duty of full disclosure, and that a presumption arises that a party who owes a fiduciary duty, and who secures a benefit through an agreement, has done so through undue influence"].) Accordingly, "whenever [spouses] enter into an agreement in which one party gains an advantage, the advantaged party bears the burden of demonstrating that the agreement was not obtained through undue influence." (*Ibid.*; accord, *In re Marriage of Wozniak, supra,* 59 Cal.App.5th at pp. 130, 132 [holding transmutation agreement was subject to the presumption of undue influence].)

"When a presumption of undue influence applies to a transaction, the spouse who was advantaged by the transaction must establish that the disadvantaged spouse's action 'was freely and voluntarily made, with full knowledge of all the facts, and with a complete understanding of the effect of' the transaction." (*In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 738-739.) The advantaged spouse must make this showing by a preponderance of the evidence. (*In re Marriage of Fossum* (2011) 192 Cal.App.4th 336, 344.) "'"The question 'whether the spouse gaining an advantage has overcome the presumption of undue influence is a question for the trier of fact, whose decision will not

be reversed on appeal if supported by substantial evidence.""""
(*Ibid.*)

2. *The Family Court Did Not Err in Finding the Sylvan*
   *Property Was Vernita's Separate Property*

As discussed, the family court found that, even if the 2004 grant deed and the 2014 deed were otherwise valid transmutation agreements, Anthony failed to rebut the presumption they had been procured by undue influence. Anthony has not challenged these findings on appeal:  He does not dispute the application of the undue influence presumption, nor does he argue the evidence at trial compelled a finding he rebutted that presumption.  Instead, Anthony argues the trial court erred by failing to apply the presumption found in section 2581 that property acquired in joint form during the marriage is community property.  While not articulated in this way, Anthony essentially argues the presumption of section 2581 should prevail over the undue influence presumption.

At least one other appellate court has rejected this precise argument when considering substantially similar facts.  In *In re Marriage of Delaney* (2003) 111 Cal.App.4th 991, the husband had purchased real property prior to meeting his future wife. During the marriage the husband executed a grant deed conveying the property to himself and his wife as joint tenants. In the dissolution proceeding the husband argued the grant deed was unenforceable because it was procured by undue influence. The wife argued the presumptions of record title (Evid. Code, § 662)[4] and community property (Fam. Code, § 2581) should have

---

[4]     Evidence Code section 662 states:  "The owner of the legal title to property is presumed to be the owner of the full beneficial

11

priority over the presumption of undue influence.  Our colleagues in Division Three of the First District considered Evidence Code section 662 first, finding "the presumption favoring stability of title found in Evidence Code section 662 is in direct conflict with the presumption of undue influence arising where one spouse obtains an advantage over the other in an interspousal property transaction." (*Delaney*, at p. 997.)  Citing "the unique protected status of marriage," the court stated that "applying the presumption of Evidence Code section 662, with its higher evidentiary standard, would in every case inevitably defeat the spousal protection intended by the Legislature in enacting section 721." (*Delaney*, at p. 997.)

The *In re Delaney* court applied that same rationale to the conflict between the presumption of undue influence and the presumption of community property under section 2581:  "To apply section 2581 to transmutations in preference to section 721 would effectively abrogate the protections given to married persons by section 721.  [Citation.]  Interspousal transactions must be governed by the fiduciary standards established in section 721, and the presumption established by that provision governs when it is in conflict with section 2581." (*In re Delaney, supra,* 111 Cal.App.4th at pp. 998-999.)

Anthony did not address *In re Delaney* in his brief, and we see no reason to depart from its reasoning here.  When, as here, the parties acquired property in joint form by means of an interspousal transaction, the court must first ensure the transaction was a valid one, in other words, that it was not the product of undue influence, before giving effect to any

---

title.  This presumption may be rebutted only by clear and convincing proof."

12

presumption that may arise by virtue of the form of ownership. To hold otherwise would, as the *In re Delaney* court explained, permit a spouse to unduly influence a transaction without consequence so long as the parties took title in joint form. Accordingly, even if the family court had considered section 2581, the court's finding of undue influence would still have taken precedence over application of the community property presumption.

### 3. *Anthony's Remaining Arguments Have Been Forfeited*

Anthony raises several additional challenges to the judgment. He argues no transmutation agreement was required because the parties' assets had been commingled, the parties had entered an oral agreement prior to marriage that the property was community property, Vernita breached the fiduciary duty owed to Anthony, the community was entitled to reimbursement for Vernita's exclusive use of the property, and the court should revisit the temporary spousal support awarded in 2019. However, Anthony's brief largely fails to identify any facts in the record or provide any legal argument explaining how the evidence at trial supports his positions.

To the extent these arguments are not moot in light of our holding the family court did not err in finding the property was Vernita's separate property, and even assuming the arguments were raised in the family court, which is not apparent from the record, the arguments are forfeited. (See *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546 ["'an appellate brief "should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration"'"].) Anthony has failed to make even a

13

minimum showing warranting consideration.  (See *Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768 ["it is counsel's duty to point out portions of the record that support the position taken on appeal"; "[t]he appellate court is not required to search the record on its own seeking error"]; *Mansell*, at pp. 545-546 [it is not the proper function of court of appeal to search the record on behalf of appellants or to serve as "backup appellate counsel"].)

## DISPOSITION

The judgment is affirmed.  Anthony is to bear his costs on appeal.


PERLUSS, P. J.

We concur:


SEGAL, J.


FEUER, J.

14