Filed 8/21/23  Marriage of Reeves CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re the Marriage of LYDIA H. KENNARD and SAMMIE L. REEVES. | B309709 |
| LYDIA H. KENNARD, | (Los Angeles County Super. Ct. No. BD604788) |
| Appellant and Cross-Respondent, | |
| v. | |
| SAMMIE L. REEVES, | |
| Appellant and Cross-Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Melinda Johnson, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Sheppard, Mullin, Richter & Hampton and Robert J. Stumpf, Jr.; Stephen Temko; Phillips Jessner and Gregory W. Jessner for Appellant and Cross-Respondent.

Complex Appellate Litigation Group, Kirstin Ault, Claudia Ribet and Charles M. Kagay; Jeffe Family Law Group, Daniel J Jaffe and William S. Ryden for Respondent and Cross-Appellant.

_____

In this dissolution action, Lydia H. Kennard (wife) appeals from a judgment that characterized a company she founded prior to marriage as community property. Wife additionally challenges the trial court's computation of spousal support and distribution of property. Sammie L. Reeves (husband) cross-appeals, also contending the trial court erred in its allocation of community property. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Husband and wife married on November 8, 1992, and separated August 7, 2014. The trial court entered a judgment of dissolution on October 26, 2020, after four years of contentious and expensive litigation.

In 1984, before marriage, wife founded Kennard Development Group (KDG). By the time they were married, KDG employed approximately 12 people and collected a little under a million dollars in annual revenue. Wife had an urban planning and management degree from Stanford University, a Master's degree in city planning from MIT, and a law degree from Harvard Law School. Husband owned a commercial furniture business.

### 1. The Antenuptial Agreement

Shortly before the wedding, wife proposed they enter into an antenuptial agreement; husband "didn't have a problem with it." On November 5, 1992, three days before the wedding, husband received from wife a proposed antenuptial agreement in which the parties agreed "that during their marriage, that all of the property that has been brought to the marriage shall retain its separate property character, regardless of whether said property is invested in community property interest or separate property interest, unless by written agreement that transmutes

2

said property from separate to community property." The separate property "include[d] all rents, issues, profits, fees, receivables, work in progress, appreciation, and income produced by the separate property of each." Husband signed the antenuptial agreement the day he received it and wife signed it the following day.

In April 1994, wife accepted an executive position at Los Angeles World Airports, a city-owned agency that manages and operates four airports including LAX. By that time, husband had closed his furniture business. They agreed the timing presented a wonderful opportunity for wife to advance her career and that husband would run KDG as its president. Although he asked for equal ownership of the business, wife only agreed to transfer 10 percent of KDG to him. He also received a salary. The parties entered into a "Modification and Reaffirmation of Antenuptial Agreement" that acknowledged wife had transferred 10 percent or 100 shares of KDG to husband while wife retained 90 percent or 900 shares. The parties expressly ratified, adopted, and confirmed the 1992 antenuptial agreement in all other respects.

## 2.    *The 1996 Estate Plan and Spousal Property Agreement*

In 1995, the parties hired the law firm of Anker & Hymes (Hymes) to create an estate plan. In a letter disclosing potential issues related to dual representation, which both parties acknowledged and accepted by their signatures, Hymes expressly disclosed, "I understand from our meeting that you both consider the great majority of your assets to be [wife's] separate property in origins (having been accumulated by her prior to marriage). We discussed at some length the advantages (mostly estate tax) of 'transmuting' some or all of [wife's] separate assets into

3

community property – as well as the disadvantages (mostly 'loss' by [wife] of a considerable portion of any assets so transmuted in the event of divorce) during our meeting. Because of the complexities of the issues involved, we will (for now) plan your estate on the assumption that [wife] will <u>not</u> transmute any of her separate property into community property. If you later decide to transmute some (or all) of [wife's] separate property into community, we will make the necessary arrangement to accomplish that result – and adjust your estate plan accordingly."

In late June 1996, husband and wife signed "The Reeves/Kennard Family Estate Plan." They concurrently signed a "Spousal Property Agreement" "to specify the character of their property interests . . . solely for the purpose of interpreting how property shall be disposed of on the deaths of the parties." The parties agreed that "except for the property described in Exhibit A, all property owned by either party, or both, as of the date of this agreement is the community property of both parties."[1] Departing from the antenuptial agreement, the parties further agreed that "all earnings for personal services of each party acquired after the date of this agreement . . . are the community property of both parties."

---

[1] Exhibit A contained a list of husband's separate property, including his 10 percent share of KDG, while Exhibit B contained a list of wife's separate property, including her 90 percent share of KDG. Although the Spousal Property Agreement does not reference Exhibit B – the wife's separate property – neither party argues that the omission transmuted wife's separate property interest in KDG to community property.

### 3. *The 2001 Estate Plan and Spousal Property Agreement*

In 2001, after the birth of their oldest child, the parties amended their 1996 estate plan. Husband would later testify that he believed the 2001 estate plan was intended to revoke the antenuptial agreement such that his and wife's separate ownership interests in KDG became community property. Wife would testify she intended the KDG ownership to be community property for estate tax purposes only. She additionally intended that any purported transmutation of KDG into community property would be automatically revoked if either filed for divorce.

Although Hymes continued to represent both parties, the previous written disclosures regarding dual representation and transmutation of separate property were not repeated to husband and wife in the 2001 estate plan. On August 8, 2001, husband and wife signed an "Amendment and Restatement of Revocable Trust" along with a new "Spousal Property Agreement." The parties acknowledged they had read the agreement "and that their counsel has explained its meaning and legal consequences to them."

Relevant to this appeal, the 2001 Spousal Property Agreement contained the following provisions:
"1.2. <u>Purpose of Agreement</u>. The parties are entering into this agreement in order to revoke that certain Antenuptial Agreement executed by the parties on November 5, 1992, as modified and reaffirmed on November 15, 1994, and to specify the character of their property interests pursuant to the applicable provisions of the California Family Code. *This agreement is not made in contemplation of a separation or marital dissolution and is made*

5

*solely for the purpose of interpreting how property shall be disposed of on the deaths of the parties.* [Italics added.]

"1.3 <u>Revocation of Antenuptial Agreement</u>. The parties hereby revoke that certain Antenuptial Agreement dated and executed by the parties on November 5, 1992, and subsequently modified and reaffirmed on November 15, 1994, and said agreement shall be of no further force or effect.

"1.4. <u>Scope and Force of Agreement</u>. The parties intend that the characterizations of their property interests made in this agreement take precedence over the forms of title in which those interests are held.

"2.1. <u>All Currently Held Property Is Community Property</u>. The parties agree that all property owned by either party, or by both, as of the date of this agreement is the community property of both parties. The parties also agree that any future rents, issues, profits, and proceeds of that property are the community property of both parties. In order to give effect to this provision, the parties are transmuting separate property, as provided below. The parties further hereby agree to sever any and all joint tenancies which they may now own and agree to hold any property heretofore or currently held by them in joint tenancy as community property other than the potential transmutation referenced in this agreement."

"2.3. <u>Transmutation of Wife's Separate Property to Community Property</u>. Wife agrees that the character of the property described in Exhibit B (including any future rents, issues, profits,

and proceeds of that property) is hereby transmuted from her separate property to the community property of both parties.[2]

"3.9. <u>Automatic Revocation</u>. In the absence of other evidence indicating the party's intent to terminate this agreement, it shall, nevertheless, be deemed mutually terminated and of no further force or effect upon either party's filing a petition, complaint or other pleading for dissolution of their marriage or divorce, or upon a court of competent jurisdiction dissolving the marriage or granting a decree of divorce or separate maintenance to either of them."

## 4.      *Subsequent Amendments to the Estate Plan*

In 2003 and 2009, the parties again amended their revocable trust. Neither party contends the 2003 or 2009 amendments are material to the issues raised in this appeal, although wife argues the 2009 estate plan evidenced her intent to maintain her separate property until the death of either spouse. The 2009 estate plan included a "Schedule of Separate Property of [Wife]," initialed by both husband and wife, that showed a "Ninety percent (90%) interest in the outstanding stock of [KDG]." Also in 2009, wife created the "Lydia Kennard Separate Property Trust," which set forth wife's separate property, including her 90 percent interest in KDG.

Husband worked at KDG from 1994 to late 2010 or early 2011. During that time, KDG transitioned from a company that mainly provided urban planning services to one that solely provided construction management work for large public entities. Husband's salary, initially ranging from $30,000 to $50,000,

---

[2]      Exhibit B to the 2001 trust was entitled "Wife's Separate Property Being Transmuted to Community Property" and included her "entire ownership interest" in KDG.

7

increased to approximately $200,000.  At trial, husband presented evidence that his efforts substantially increased the company's profile, its revenue, the number of employees, and the size of its projects though he later admitted it never made a profit under his leadership.

In 2007, wife returned to work at KDG.  She became increasingly involved in the day-to-day operations, resuming control in 2011.  Husband stopped working entirely at that time.  The trial court found KDG experienced significant growth in revenue and profit under wife's leadership after 2014.

## 5.    *The Dissolution Proceedings*

On July 11, 2014, wife filed a petition for legal separation, which she amended on August 7, 2014, to a petition for dissolution of marriage.  On August 28, 2014, husband filed a response and request for dissolution.

The case was tried in four phases before the Honorable Melinda Johnson (retired) as judge pro tem pursuant to the parties' stipulation.  This appeal is concerned with the rulings issued after the first and third phases of trial.

In the first phase of trial, held in April 2017, the court heard testimony and received evidence regarding the validity and enforceability of the antenuptial agreement and the 2001 Spousal Property Agreement.  It determined the 2001 Spousal Property Agreement revoked the antenuptial agreement and transmuted the parties' separate property, including their individual ownership interests in KDG, to community property.[3]

---

[3]    The 2001 Spousal Property Agreement revoked the November 5, 1992 Antenuptial Agreement (as subsequently modified and reaffirmed on November 15, 1994).

8

In the second phase of trial, the court determined the appropriate date of valuation for KDG. The trial court's later ruling mooted this finding when it ordered KDG to be sold with the sales proceeds to be divided equally between the parties.

In the third phase of trial, held in February and May 2019, the trial court heard testimony and received evidence on numerous issues concerning the division of property and spousal and child support. The trial court issued a 30-page final statement of decision with extensive findings and rulings, including ordering the sale of KDG. Because the marital estate is large, we discuss below only the support orders and divisions of property that the parties dispute.

In the fourth and final phase of trial, occurring in March 2020, the trial court determined attorney fees and costs. By then, the parties had expended approximately $6 million in fees and costs, which the court found to be excessive relative to the size of the marital estate.

On October 26, 2020, the trial court entered its final judgment, summarizing its findings and rulings from the previous four statements of decision. Wife filed a notice of appeal on December 4, 2020, and husband filed his cross-appeal on December 16, 2020.

## DISCUSSION

KDG is the primary asset in the marital estate and forms the basis for the parties' disputes in this appeal. Wife contends KDG is her separate property and the trial court erred when it interpreted the 2001 Spousal Property Agreement to transmute KDG to community property despite express language that the agreement would be automatically revoked upon dissolution of the marriage and that the terms of the agreement would only

9

take effect upon the death of one of the spouses.  Alternatively, wife asserts the transmutation was a product of undue influence.

Wife next contends the trial court's spousal support calculation is unsupported by substantial evidence.  Wife lastly argues the trial court impermissibly "double dipped" when it awarded all of KDG's income to wife in calculating her spousal support obligation to husband but later took back $2,239,870 in perquisites, which were derived from the same income previously awarded to her, in the property allocation.

In his cross-appeal, husband contends wife received approximately $1.6 million more in distributions from KDG than he did.  He also contends wife used those distributions to pay personal expenses.  Husband asserts wife, as the managing spouse, had the burden to prove the reason for the distributions.  Because wife failed to meet this burden, husband contends he is entitled to an equalizing payment of $814,412.  Husband next argues the trial court improperly awarded all of KDG's income from January 1, 2019 to May 31, 2020 to wife in violation of its obligation to divide the income evenly.  Finally, husband contends the trial court failed to take into account the tax consequences of its treatment of wife's postseparation compensation from KDG.

We find wife's and husband's arguments unpersuasive.

### 1.     The 2001 Separate Property Agreement Transmuted Wife's Separate Property to Community Property

Wife's appeal primarily challenges the trial court's ruling in the first phase of trial:  that the 2001 Separate Property Agreement revoked the antenuptial agreement and transmuted the parties' separate property, including KDG, to community property.

10

### a. Applicable Legal Principles and Standard of Review

Both before and during marriage, spouses may agree to change the status of any or all of their property through a property transmutation.  (Fam. Code, § 850; *In re Marriage of Campbell* (1999) 74 Cal.App.4th 1058, 1062.)[4]  Section 850, subdivision (b), provides that married persons may transmute the separate property of either spouse into community property "by agreement or transfer," subject to the provisions of sections 851 to 853.  Section 852, subdivision (a), in turn, requires:  "A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected."  To satisfy the requirement of an "express declaration," the writing need not use any particular language, including the terms "transmutation," "community property," or "separate property."  But, it "must unambiguously indicate a change in the character or ownership of property."  (*In re Marriage of Starkman* (2005) 129 Cal.App.4th 659, 664 (*Starkman*); *In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1400.)

Prior to 1984, "it was ' "quite easy for spouses to transmute both real and personal property" ' because a transmutation could be proved by evidence of an oral agreement between the spouses or by ' "implications from the conduct of the spouses." ' "  (*In re Marriage of Valli, supra,* 58 Cal.4th at p. 1401.)  By adopting the express written transmutation requirements, the Legislature intended " 'to remedy problems which arose when courts found

---

[4]      All further section references are to the Family Code unless otherwise specified.

11

transmutations on the basis of evidence the Legislature considered unreliable.' " (*Ibid.*)

"In deciding whether a transmutation has occurred, we interpret the written instruments independently, without resort to extrinsic evidence." (*Starkman, supra,* 129 Cal.App.4th at p. 664; *Estate of MacDonald* (1990) 51 Cal.3d 262.)

### b. *Holtemann* and *Lund*

Two cases are central to the transmutation issue raised in this appeal, *In re Marriage of Holtemann* (2008) 166 Cal.App.4th 1166 (*Holtemann*) and *In re Marriage of Lund* (2008) 174 Cal.App.4th 40 (*Lund*). They present substantially similar facts and address the same issues raised by wife in this matter.

In *Holtemann*, the parties, with assistance of counsel, executed trust documents to eliminate the need for probate and to minimize estate taxes by transmuting the parties' separate property to community property. The trust document also expressly allowed either spouse to revoke or terminate the trust. Later, when the wife filed for dissolution, the husband attempted to revoke the trust and thereby rescind the transmutation. (*Holtemann, supra,* 166 Cal.App.4th at p. 1171.)

The *Holtemann* court held the transmutation was valid and could not be unilaterally rescinded, even though the trust was revoked. The court relied on the plain language of the transmutation agreement, which expressly stated in various places and in various ways, that the husband agreed to transmute the character of his listed separate property to community property of both parties. (*Holtemann, supra,* 166 Cal.App.4th at pp. 172–173.)

The husband argued the transmutation became invalid due to the dissolution proceedings because the agreement stated "it

12

was not made in contemplation of a separation or marital dissolution and is made solely for the purpose of interpreting how property shall be disposed of on the deaths of the parties." The court was not persuaded: "Regardless of the motivations underlying the documents, they contain the requisite express, unequivocal declarations of a present transmutation." (*Holtemann, supra,* 166 Cal.App.4th at p. 1173.) "In any event," the court continued, "we are not aware of any authority for the proposition that a transmutation can be conditional or temporary." (*Id.* at p. 1174.) Instead, the trust provided that the property remained "community property" even upon revocation of the trust. (*Ibid.*) The evidence was clear that both spouses in *Holtemann* knew the legal consequences of the change at the time it was made. Thus, the only way to have reconveyed the property to the husband as his separate property would have been by another express written transmutation agreement of both husband and wife. (*Ibid.*)

In *Lund*, the parties' trust documents specified that husband "for estate planning purposes" desired to convert his separate property into community property. (*Lund, supra,* 174 Cal.App.4th at p. 44.) The trust documents specified that all of the husband's separate property "is hereby converted to community property of Husband and Wife . . . ." Both parties executed mutual wills with similar provisions. (*Id.* at pp. 44, 52.) The trust also automatically terminated upon dissolution resulting in the "return to each Settlor the separate property they contributed to this Agreement not previously disposed of . . . ." (*Id.* at p. 48.)

Relying on *Holtemann*, the *Lund* court held that neither the automatic termination upon marital dissolution clause nor

the words "for estate planning" as an apparent motivation for the trust had any effect on the clear and direct words of the transmutation agreement itself.  (*Lund, supra,* 174 Cal.App.4th at pp. 53-54.)  To enforce an implied automatic revocation of transmutation or read a contingency into a direct statement would violate both the express, written declaration provisions of section 852, and involve the court in perpetrating a fraud on the IRS.  The court further held the transmutation agreement could not be undone either automatically, or by the action of only one spouse, regardless of motive.  (*Id.* at p. 55.)

### c. The 2001 Spousal Property Agreement Contained an Express Declaration That Transmuted Wife's Separate Property to Community Property

Like the trial court, we conclude *Holtemann* and *Lund* are dispositive.  The record shows wife signed a document that states in unambiguous terms that the parties' antenuptial agreement is revoked and that "the parties are transmuting separate property. . . ."  Specifically, "Wife agrees that the character of the property described in Exhibit B (including any future rents, issues, profits, and proceeds of that property) is hereby transmuted from her separate property to the community property of both parties."  Listed in Exhibit B is wife's 90 percent ownership in KDG. The term "transmutation" or its derivatives is used repeatedly throughout the property agreement.  " '[A] clearer statement of a transmutation is difficult to imagine.' " (*Holtemann, supra,* 166 Cal.App.4th at p. 1173.)  As in *Holtemann* and *Lund,* neither section 1.2 of the Spousal Property Agreement (stating the agreement was made solely to address the disposition of property upon death of the parties and not in

14

contemplation of dissolution) nor section 3.9 (automatic termination of the agreement upon dissolution of marriage) had any effect on these clear and direct words of transmutation.

Wife's attempts to distinguish *Holtemann* and *Lund* are unavailing. Wife contends *Holtemann* never referred to a "potential" transmutation like the 2001 Spousal Property Agreement does. Wife also contends the automatic termination provision in *Lund* is distinguishable because it was contained in a separate document rather than the property agreement itself. These minor distinctions do not affect our analysis.

Wife nevertheless seizes on the trial court's observation that "[attorney] Hymes' intent, and perhaps [wife's] – although not [husband's] – was to have the best of both worlds – community property tax advantage upon death and separate property retention in the case of divorce." The court found these intents were "inconsistent and, to a large extent, irreconcilable." The court observed, "The language in the 2001 document states that the revocation and transmutations are currently effective and absolute, <u>and</u> that they are potential [*sic*] to take effect at the death of the first, <u>and</u> that they are conditional upon neither party filing a petition for dissolution at which point they are ineffective."

She argues these "irreconcilable" provisions rendered the agreement "*at least* ambiguous" under *In re Marriage of Benson* (2005) 36 Cal.4th 1096 (*Benson*) and *Starkman, supra,* 129 Cal.App.4th at page 662. According to wife, the trial court was required to find a transmutation did not occur due to these inconsistencies.

We disagree. *Holtemann* and *Lund* cogently addressed these issues while *Benson* and *Starkman* did not. *Benson, supra,*

15

36 Cal.4th at page 1100 involved an oral, not a written, promise: the husband claimed he conveyed to the wife his community property interest in their home after she orally promised to waive, in writing, her community property interest in his retirement accounts. The Supreme Court held no transmutation of his retirement accounts occurred. The wife never executed a written declaration and the husband's transfer of the family home, while evidence of partial performance of the bargain, was not an adequate substitute for an express statement under the statute. (*Ibid.*)

In *Starkman, supra*, 129 Cal.App.4th at page 665, a paragraph in the spouses' trust agreement provided that the property transferred to the trust "is the community property of both of them unless such property is identified as the separate property of either Settlor." (*Id.* at p. 662.) The trust did not expressly identify any separate property. The court nevertheless held this clause did not unambiguously establish that the husband effected a wholesale change of ownership in his separate property by transferring it to the trust, particularly when other language in the trust could reasonably be interpreted to mean that separate property retained its separate property characterization. The court suggested the parties could have complied with the requirements of section 852 if the husband had agreed that any property transferred to the trust "becomes" or "is changed into" community property. (*Id.* at p. 665.)

### d. Substantial Evidence Supports the Finding That the Transmutation Was Not a Product of Undue Influence

Next, wife contends any transmutation was invalid because she could not have predicted *Holtemann* and *Lund* would render

16

a conditional and revocable transmutation into an unconditional and irrevocable one seven years later.  We are not persuaded.

A writing that satisfies section 852 is invalid if the court finds it is the product of undue influence.  Spouses are governed by rules of fiduciary duty precluding them from taking unfair advantage of each other.  (§ 721, subd. (b).)  If a spouse "secures an advantage over the other, the confidential relationship will bring into operation a presumption of the use and abuse of that relationship by the spouse obtaining the advantage."  (*In re Marriage of Baltins* (1989) 212 Cal.App.3d 66, 88.)  An interspousal transaction benefitting one spouse is presumptively induced by undue influence.  (*In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 293-294; *In re Marriage of Barneson* (1999) 69 Cal.App.4th 583, 588.)

To rebut the presumption, the benefitted spouse must show "the disadvantaged spouse's action 'was freely and voluntarily made, with full knowledge of all the facts, and with a complete understanding of the effect of' the transaction."  (*In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 738-739.)  This is a factual issue reviewed for substantial evidence.  (*Id*. at p. 737.)

The trial court set out the substantial evidence supporting its finding that wife had full knowledge of the facts and a complete understanding of the legal effect of the transmutation: "Wife was provided with a detailed explanation (albeit six years earlier) of the possible negative consequences of a transmutation and made a considered decision NOT to transmute her separate property at that time.  Here, the drafting attorney testified that he would not have done a transmutation agreement or a revocation of a prenuptial agreement without clear direction from Wife to do so.  The Agreement itself, at section 1.6 says 'their

17

counsel has explained its meaning and legal consequences to them.' Although the word 'understood' is not used, all counsel can actually do to effect an understanding is explain possible legal consequences. Given the parties' intelligence, sophistication and training, the only reasonable inference is that they understood what they were explained." Substantial evidence supports the trial court's finding that wife's decision to transmute her separate property was freely and voluntarily made.

Wife challenges this finding, relying on the trial court's observation that *Holtemann* "came as something of a shock to the estate planning bar." According to wife, this observation is dispositive on the issue of whether wife had a complete understanding of the legal consequences of the transmutation at the time of execution. Wife's theory is that if Hymes, a member of the estate planning bar, believed a conditional transmutation was lawful in 2001, then that is what Hymes would have conveyed to wife and thus wife lacked a complete and full understanding of the consequences of her decision.

The trial court acknowledged: "Hymes, like the drafting attorneys in <u>Holtemann</u> and <u>Lund</u> believed he could create a conditional transmutation. All three Counsel were in error, although that could not have been clearly known to them until seven years after the Kennard/Reeves documents were executed. [Wife] was informed of the <u>possible</u> legal consequences, known by an experienced estate planning attorney at the time, and made her decisions accordingly. The fact that the consequences were <u>inevitable</u>, rather than merely possible, does not equate to her not having an understanding of the legal effect of the agreement at the time she signed it."

18

In short, the trial court found that Hymes advised wife about the possible consequences of a transmutation — loss by wife of her separate property. If Hymes, as wife asserts, was certain that he could create a conditional transmutation, his warning about potential loss in the event of divorce would have been unnecessary. Indeed, *Holtemann* did not represent a change in the law so much as a clarification of it. *Holtemann* itself observed there was no authority for a conditional transmutation, not that it disagreed with existing authority allowing it. (*Holtemann, supra,* 166 Cal.App.4th at p. 1174.) The trial court was entitled to weigh this evidence against wife's testimony that she believed Hymes could create a conditional transmutation. (*Lund, supra,* 174 Cal.App.4th at p. 56.) The trial court reasonably concluded from these circumstances and from wife's position as a sophisticated businessperson with a law degree that the transmutation was not a product of undue influence. (*In re Marriage of Mathews* (2005) 133 Cal.App.4th 624, 632 [no undue influence where wife handled all financial affairs for both herself and the family].)

## 2. *The Trial Court Did Not Abuse Its Discretion When It Calculated the Marital Standard of Living to be Higher Than What Wife's Expert Suggested*

In the third phase of trial, the trial court calculated wife's spousal support obligation to husband by first determining the parties' marital standard of living. Wife contends the trial court erred when it adopted her expert's income-based approach to calculate the marital standard of living but declined to adopt the expert's conclusion that it equaled $20,000 per month. According to wife, the court's upward adjustment was not supported by evidence. The record demonstrates otherwise.

19

### a.　Standard of Review and Applicable Legal Authorities

Spousal support is governed by statute.  (See §§ 4300–4360.)  "[T]he court may order a party to pay for the support of the other party an amount, for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances as provided in [section 4320]."[5]  (§ 4330; *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 302.)  The marital standard of living, which describes the "station in life that the parties had achieved by the date of separation," "is neither a floor nor a ceiling for a spousal support award."  (*In re Marriage of Nelson* (2006) 139 Cal.App.4th 1546, 1560; *In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 491 (*Smith*).)

As a general rule, "we review spousal support orders under the deferential abuse of discretion standard.  [Citation.]  We examine the challenged order for legal and factual support.  'As long as the court exercised its discretion along legal lines, its decision will be affirmed on appeal if there is substantial evidence to support it.'  [Citations.]  'To the extent that a trial court's exercise of discretion is based on the facts of the case, it will be upheld "as long as its determination is within the range of the evidence presented." ' "  (*In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1443.)  "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or

---

[5]　Section 4320 requires the court to consider a number of circumstances, such as the earning capacity of each party and the duration of the marriage, in ordering spousal support.  Wife does not contend the trial court erred in its evaluation of the section 4320 circumstances.

arbitrary that no reasonable person could agree with it.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

### b.     Proceedings Below

At trial, wife's expert calculated the marital standard of living by using a weighted average of the parties' income for the last three years of marriage (2011 to 2014), reduced by income tax and child support, among other things.  On direct, wife's expert testified each party needed $17,280 per month, after taxes, to live at the marital standard of living.  On cross, he acknowledged that an investment resulting in a loss should not have been subtracted from the parties' income, resulting in an increase of the marital standard of living to $20,000 per month. Husband's expert, on the other hand, considered only the family's 2013 expenses to calculate the marital standard of living, arriving at a figure of $54,402 per month for each spouse.

The trial court agreed in concept with wife's income-based approach but not with the expert's application of it.  It declined entirely to adopt husband's expense-based approach because wife contributed a "one-time infusion of cash" from inherited funds to the community in 2013 that was spent on remodeling the family home.  The court found "as a guidepost" that each party needed $35,000 per month to live at the marital standard, which is approximately halfway between the experts' calculations.  The court explained its adjustment:  "the upward trajectory of income should be considered, particularly as that trajectory has continued.  The court also finds a cost of living adjustment to be appropriate, and considers that more than 50 [percent] of the adults' combined expenses is necessary for each to maintain the marital standard, given that economies of scale are lost when

21

there are two households." After taking into account the section 4320 circumstances, the court awarded permanent spousal support in the amount of $27,000 per month if taxable or $16,000 per month if nontaxable.

### c. The Trial Court Did Not Abuse Its Discretion When It Adjusted the Marital Standard of Living Calculation From That Suggested By Wife's Expert

The trial court did not abuse its discretion when it determined the marital standard of living to be $35,000 per month for each spouse, a $15,000 departure from the figure suggested by wife's expert. In the exercise of its broad discretion, the trial court is not required to accept the opinion of any expert; differences between the experts' opinions go to the weight of the evidence. (See *In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 752–753.). The trial court cited three factors leading to the upward adjustment: the trajectory of the parties' income, cost of living, and increased costs in maintaining two households. Wife does not contend these factors may not be considered in evaluating the marital standard of living but contends the court was required to assign a specific dollar amount to each factor. Wife has presented no authority that a trial court is required to do so. Although "[t]rial courts . . . are encouraged . . . to make more specific findings," "the more specific the better," the marital standard of living is not intended to be a "narrowly define[d] mathematical standard." (*Smith, supra*, 225 Cal.App.3d at p. 491.)

Wife also argues the evidence does not support the court's adjustments. As to the upward trajectory of income, wife points to the parties' adjusted gross income, which decreased from 2011

22

to 2013. The court was entitled to disregard this evidence and rely instead on evidence of KDG's skyrocketing profitability since KDG was the primary source of income, and wife had control over her own compensation from KDG. At trial, wife presented evidence showing KDG posted a loss in 2011 of $218,875 but had net income of $66,218 in 2012 and $672,302 in 2013. Indeed, KDG made millions in profits in subsequent years — $2.2 million in 2014, $1.1 million in 2015, and $1.5 million in 2016. The court was entitled to consider KDG's income instead of the parties' reported adjusted gross income to conclude the parties' income was on an upward trajectory.

The trial court was also entitled to consider inflation and that "[a]fter separation the parties have two households rather than one, and with California's high housing costs this represents a significant increase in living expenses." (*Smith, supra,* 225 Cal.App.3d at pp. 488–489.)[6] This is particularly true when the marital standard of living is high and the evidence shows both parties are accustomed to living in a large, recently renovated house. Given this substantial evidence, we conclude the trial court did not abuse its discretion when it determined the marital standard of living.

---

[6] Wife contends the parties presented no evidence of inflation at trial. Wife's counsel, in his arguments on spousal support, acknowledged inflation was low during the period leading to separation, but did not assert it was nonexistent. On appeal, we have taken judicial notice of the rate of inflation from 2013 to 2020 as reported by the Federal Reserve Bank of Minneapolis.

***3.*** *The Trial Court Did Not Abuse Its Discretion in Allocating KDG Income and Distributions*

The remaining disputes between the parties involve the allocation of both KDG income and distributions made by KDG to wife. An overview of KDG's operations is helpful to understand these issues. KDG is a Subchapter S corporation with pass-through income and tax liability election. This means its owners report KDG's income and pay its income taxes through their personal tax returns. From the date of separation until December 31, 2019, wife was responsible to pay KDG's income taxes. Since 2011, wife has managed and controlled KDG's operations, including its cash and noncash distributions to the parties. As a general proposition, unless there has been a distribution out of KDG, the profits earned by KDG have remained within the company and thus will affect the future value of KDG. The trial court ordered KDG to be sold with the sales proceeds to be split equally between the parties.

With this background in mind, we now consider the parties' remaining arguments.

**a.** **The Trial Court Did Not Impermissibly "Double Dip"**

Wife challenges the court's allocation to the community of more than $2 million in perquisites she received from KDG from 2014 to 2018. According to wife, the trial court impermissibly "double dipped" when it awarded "all" KDG income to wife in its temporary spousal support order, which wife used to pay spousal support to husband, but then later took the $2 million in perquisites (paid from KDG income) away in the guise of a community property division. The record and the law rebut wife's double dip theory.

24

The record shows that in 2017, the court ordered wife to pay pendente lite spousal support to husband in the amount of $34,392 per month, retroactive to September 12, 2014. Observing there were discrepancies between what wife reported to the court as her annual income and what she reported to a bank when applying for a loan, the court deemed wife's average KDG income to be approximately $78,000 per month, of which $34,767 came in the form of perquisites. Taking into account wife's non-KDG income, the court determined wife had an average total income of $100,000 per month available for support payments. In reaching that conclusion, the court "attribute[d] all income and profits from KDG to [wife]" for purposes of the support award, but qualified that "[t]his is not meant to be a characterization of the assets as separate or community."

In 2020, in the third phase of trial, the court determined that wife's reasonable compensation from KDG, including salary and perquisites, totaled $1.2 million per year postseparation. The court also found that from 2014 to 2018, husband received a total of $54,592 and wife received $2,239,870 in perquisites from KDG. By this time, the trial court had determined that KDG was community property. The court found it was impractical, however, to redistribute KDG profits from 2014-2018 to reflect the community property character of the business, "which would lead to a re-calculation of support, a re-determination of fee contributions, a re-allocation of tax liability, etc. However, there must be some acknowledgement of excess use of KDG funds beyond what has found to be reasonable, and beyond what was contemplated when the support and early fee orders were made." The court thus charged husband $54,592 and wife $2,239,870 in community funds. The court ordered these amounts to be

25

"returned to the balance sheet."  The court additionally ordered a $781,866 credit to wife representing the difference between what KDG paid her from 2014 to 2020 and what the court had determined to be her reasonable compensation (including perquisites).  The effect of these orders was that wife received the perquisites she was entitled to and any excess distribution was returned to the community.

Wife filed extensive objections to the court's treatment of these perquisites, advancing her double dip theory and other arguments.  The court held a separate hearing allowing further argument on the allocation of perquisites but did not change its ruling.

On appeal, wife contends she used the KDG perquisites to pay spousal support to husband.  Therefore, it was an impermissible double dip to also give husband half of the perquisites in a later division of property.

We start with the legal principle that, "it must be kept in mind that spousal support considerations are separate and distinct from property division concepts.  Because the division of community property is premised on absolute ownership of community assets by both parties, each must receive a respective full share.  An award of spousal support, in contrast, is broadly discretionary." (*In re Marriage of White* (1987) 192 Cal.App.3d 1022.)  Thus, "[s]upport cannot be awarded in lieu of an equal division of community property [citation] or to compensate for an unequal division." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2016) ¶ 6:980, p. 6–507.)  The source of spousal support is often the supporting spouse's separate property or their half of community property.  (*In re Marriage of Epstein* (1979) 24 Cal.3d 76, 91 fn. 14.)

26

Under these authorities, the trial court properly calculated spousal support based on wife's separate income, which included income and perquisites from KDG, and later charged wife with the excess perquisites she received to ensure an equal division of the community income derived from community property.

The facts also disprove wife's double dip argument: The trial court awarded husband temporary spousal support on the assumption that wife had over $100,000 in income to pay for it, of which $78,000 came from KDG in the form of salary and perquisites. In its final judgment, the court determined wife was entitled to $100,000 per month or $1.2 million per year in salary and perquisites from KDG alone. This was $22,000 more per month than its original $78,000 assumption. Rather than recalculate its spousal support order based on wife's increased income and reallocate KDG's profits and associated tax liability, the court acknowledged there was excess use of KDG funds by the parties from 2014 to 2018 in the form of perquisites and returned those sums to the community ledger. Under these facts, the court did not award all KDG income to wife in 2017 and then later take away $2 million of it away from her in the division of property in 2020. The record shows it only allocated all KDG income to her for the purpose of calculating spousal support but expressly did not determine whether that income was community or separate property. Absent actual distributions from KDG, the income that was allocated to wife remained in the company.

In sum, we are not persuaded by wife's double dip theory. Having addressed wife's arguments on her appeal, we now turn to the issues raised in husband's cross-appeal.

27

### b. The Trial Court Did Not Abuse Its Discretion When It Denied Husband's Request for an Equalizing Payment for Excess Distributions

According to husband's expert, from 2014 to 2018, wife received $1,826,503 in distributions that were in excess of her salary and perquisites while husband only received $197,680.[7] Husband asserts these excess distributions were used for wife's personal expenses, including payment of her personal income taxes and her spousal and child support obligations. Husband calculates that, based on wife's personal use of community funds, he is owed an $814,412 equalization payment, calculated by taking 1/2 of $1,826,503 less the $197,680 husband already received which equals $814,412. The trial court denied his request. We conclude the trial court did not abuse its discretion in denying the request.

Under section 2550, the court must divide the community estate equally, except as the parties have otherwise agreed or under limited circumstances not applicable here (see §§ 2500–2660). A trial court has broad discretion to accomplish an equal allocation and may award one or more items of property to one party with an equalizing payment to the other. (*In re Marriage of Andresen* (1994) 28 Cal.App.4th 873, 880.) "This task constitutes a nondelegable judicial function [citation] which must be based upon substantial evidence." (*Ibid.*) A court may consider not only statutory and case law, but also equitable factors in its allocation, including whether fairness to the parties requires consideration of who managed and controlled community assets and complied with related fiduciary duties. In *Marriage of*

---

[7] These distributions are separate from the perquisites discussed above.

28

*Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th 1252, 1257 (*Margulis*), for example, the court held that "once a nonmanaging spouse makes a prima facie showing concerning the existence and value of community assets in the control of the other spouse postseparation, the burden of proof shifts to the managing spouse to rebut the showing or prove the proper disposition or lesser value of these assets. . . . If the managing spouse fails to meet this burden, the court should charge the managing spouse with the assets according to the prima facie showing."

Here, the trial court declined to equalize the purported excess distributions made to wife because the evidence showed a "large part" of the distributions were used to pay KDG's taxes. Substantial evidence supported the trial court's finding:  At trial, husband's expert admitted wife claimed and paid "90 percent of the company's income on her individual taxes."  Indeed, the trial court ordered wife to pay KDG's income taxes from 2014 to 2019. KDG was a subchapter S corporation, with pass-through tax liability to its owners.  Thus, wife's effective tax rate of 44 percent was also KDG's tax rate.  The evidence shows KDG's profits each year were a million dollars or more beginning in 2014.  From these facts, it is reasonable to infer wife used a "large part" of the distributions to pay KDG's taxes.  The trial court did not abuse its discretion when it declined to make the equalizing adjustment requested by husband.

Husband acknowledges wife received distributions for the payment of KDG's income taxes but faults the trial court for its failure to assign a specific dollar amount to what was used to pay KDG's taxes and what was used to pay wife's personal expenses. He argues the court was required to do so to ensure wife's use of community income for her personal expenses could be equalized.

Husband provides no legal authority that requires this level of precision in the court's findings, particularly when those findings are supported by substantial evidence.

Relying on *Margulis, supra,* 198 Cal.App.4th at page 1267, husband nevertheless asserts he presented a prima facie case that the distributions were used for wife's personal expenses and wife, as the managing spouse, bore the burden to rebut his showing. Husband cites to the trial court's observation that husband "was hampered by often receiving late and/or incomplete and/or inaccurate information regarding the business and its non-operational assets." Husband concludes that, because wife failed to make the showing, *Margulis* required the court charge wife with over $1.8 million in excess distributions according to husband's showing and order the $814,412 equalizing payment to husband. (*Margulis, supra,* at p. 1267.)

Unlike in *Margulis,* the record in this matter demonstrates husband had access to the financial information necessary to meet his burden of proof. (Evid. Code, § 500 ["a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting"].) At trial, husband's expert testified he prepared an analysis of how the $1,826,504 in distributions were spent "[b]y looking at the books and records of KDG and also the individual income tax returns of [wife]." Under these circumstances, the trial court reasonably concluded that *Margulis* does not apply to shift the burden of proof.

In any event, although the court acknowledged "some" of the distributions were used to pay wife's personal expenses, the court concluded that reallocating the distributions and recalculating the taxes payable and support due "would be costly

beyond the value of the information received." While husband's expert may have expressed an opinion on what portion of the distributions were used for wife's personal expenses, he did not also recalculate the consequences of a reallocation – the amount of taxes husband would have to pay and the amount of support he would be owed. The court determined the cost to perform these recalculations would exceed the benefit derived from them. The record supports this finding. By the time a final judgment was rendered in 2020, the parties had incurred over $6 million in attorney fees and costs, which the trial court found to be "extremely high" given the size of the estate. The trial court had presided over this matter for four years; it was in the best position to evaluate whether the value of the information sought would exceed the cost to obtain it.

### c. The Trial Court Properly Retained Jurisdiction to Consider Claims of Excess Distributions from KDG After January 1, 2019

In the third phase of trial, the court ordered, "For the purpose of proceeding with the final stages of trial, discovery regarding distributions to [wife], directly to her or for her benefit, in excess of her reasonable compensation was cut off as of December 31, 2018. Reimbursements to the community were calculated as of this date. Jurisdiction is reserved as to any claims of excess distributions to or for [wife] on or after January 1, 2019." The trial court then ordered, "Commencing June 1, 2020, the parties shall equally share KDG's profits, pending its sale. The parties are each responsible for taxes and other liabilities on their respective shares of KDG profits." Husband interprets these orders to mean the trial court effectively allocated all KDG income from January 1, 2019 to

31

May 31, 2020 to wife.  Wife does not disagree with this characterization of the court's orders.  Husband asserts it was error to divide KDG's income unequally for that time period.

We conclude the court did not abuse its discretion because it expressly reserved jurisdiction to consider any claims by husband that KDG made excess distributions to wife on or after January 1, 2019.  The court ordered equal distribution of profits beginning June 1, 2020.  From January 1, 2019 to May 31, 2020, if wife received any cash or noncash distributions or perquisites from KDG in excess of her reasonable compensation, the trial court's order leaves room for husband to seek reimbursement to the community from the court.

### d. Husband Failed to Demonstrate He Would Be Responsible to Pay Taxes on Wife's Separate Income

As we have just described, the trial court determined wife's reasonable compensation from KDG beginning 2014 was $1.2 million per year.  It further determined she was underpaid by $781,866 for the period from 2014 to 2020, and ordered a credit to wife in this amount.  Husband does not dispute the amount of additional compensation wife was owed.  He instead asserts the trial court should have ordered KDG to pay wife directly rather than order an equalizing credit on the community property balance sheet.  Husband contends the trial court's treatment of the underpayment would result in husband assuming half of the taxes on wife's separate property income.[8]  Husband explains it

---

[8] Wife asserts husband has forfeited this argument because he raised it after the trial court issued its final statement of decision for the third phase of trial.  We decline to find forfeiture because husband made this argument to the trial court before

this way: "if KDG had been required to pay [wife] her compensation directly, she would have received $390,933 in additional income on which she would have been required to pay taxes ($781,866 excess income minus $390,933 less in profit distribution). [Husband], on the other hand, would have received $390,933 less in KDG profits, thereby lowering the amount of income on which he would have been required to pay taxes."

Husband's argument assumes the additional income would all be paid out after June 1, 2020, when he became entitled to receive half of KDG's profits and obligated to pay half of its tax liability.[9] The record does not support husband's assumption that the $781,866 was an expense that could be applied solely against KDG's 2020 income when that amount represented underpayment over six years. Nor does husband explain how a pass-through tax liability for an S corporation would not have already been paid or accrued by wife over those years when she alone was responsible for paying KDG's taxes through her personal income tax return. We are not persuaded husband has

---

final judgment was entered. "Even after a court has issued a written decision, the court retains the power to change its findings of fact or conclusions of law until judgment is entered." (*Bay World Trading, Ltd. v. Nebraska Beef, Inc.* (2002) 101 Cal.App.4th 135, 141.)

[9] Husband asserts, "the judgment in the case was not entered until October 2020, and the same judgment also provided that KDG profits would be shared equally commencing June 1, 2020. This means that [wife] received her compensation no earlier than October 2020, at which time [husband] was entitled to half the company's profits."

33

shown he would be responsible to pay tax on wife's separate income earned prior to June 1, 2020.

## DISPOSITION

The judgment is affirmed. The parties to bear their own costs on appeal and cross-appeal.


RUBIN, P. J.

WE CONCUR:



BAKER, J.



KIM, J.